FILED

CLERK, U.S. DISTRICT COURT

02/13/2025

CENTRAL DISTRICT OF CALIFORNIA

BY_____DVE_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

Robert V. Gonzales
PO BOX 7804
SLT, CA 96158
Telephone:    530-523-3822

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

ROBERT V. GONZALES,

          Plaintiff,

    v.

THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA, Et. Al.

         Defendants.

**CASE NO.  8:23-CV-01788-JVS(KESx)**

Declaration in Support of Motions

**Date & Time: Hearing w/ Subsidized**

**Appearance by Parties Requested**

**Dept: 10C**

**Judge: Hon. James Selna**

CONTENTS

1. CV-66                               PG. 1-8

2. G-92                               PG. 9

2. Case Summary                PG. 11-12

3. Exhibits A(1-12)             PG. 13-25

4. Exhibits B(1-13)             PG. 25-36

5. Exhibits C(1-4)              PG. 36-402

6. Exhibits D(1)               PG. 43

**CASE SUMMARY**

The theory for an exception to the normal requirements for exhausting judicial remedies derives from the two threats of State prosecution under CPC 632 during university proceedings, without pending State litigation, but with other irreparable injuries relevant to those proceedings (*Steffel v. Thompson*, *415 U.S. 452 (1974)*). My issues with the University of California, Irvine began in 2020 when I was assigned a mental health counselor as opposed to directed to the whistleblower office to investigate a picture of my former Norcal warehouse boss on the Socal university law school's career office website (s*ee Ex. B(13) pg. below*). The significance of the photo is that this former Marine Corps veteran boss threatened to retaliate against "my future" when he was firing me from that position. After many other unusual incidences on campus demonstrated by Exhibits A(6) and B(12) materials below occurred, the same official who assigned me to a mental health counselor breached a specific duty of care in dorm housing when she ignored my inquiries related to a food safety issue, and the breach of this duty of care directly led to my unusually lengthy suspension (s*ee Ex. B(13) pg. below*). The student conduct investigator assigned to my case lied up to ten times to make biased determinations as well as to influence those of members of the Student Conduct Review Board during my university appeal proceeding (*see Ex. B(3-6) pg. below*). During my student conduct proceedings, I was removed from student housing, contacted by COVID-19 contact tracing, placed in quarantine housing, removed from quarantine by the student conduct office before the two-week period established by the CDC, and I returned to my dorm in a state of duress (s*ee Ex. B(9) pg. below*). I was expected to study for and take my finals from my car, or either repeatedly drive 600 miles one way in order to retrieve my property when the student conduct office permitted me to retrieve it from my dorm or pay for more than two weeks of accommodation expenses while I waited for that permission (*see Ex. B(9) pg. below*). In the terms of my suspension, I was assigned a term of disciplinary probation "for the duration of my academic enrollment" against university policy (*see Ex. A(3) pg. below*). My disciplinary probation is significant because I can only qualify for the financial aid that enables my academic enrollment in the first place if I am in "good standing" with the University of California, so my

suspension against university policy constitutes an irreparable injury to my financial aid qualifications (*see Ex. A(3) below*).  The breach of the duty of care and the biased student conduct proceedings also constitute an irreparable injury to (1) the seven years before attending at UCI where almost all of my academic and free time was spent earning a double major at my community college; (2) the five years where the stresses of the suspension of my young-adult life's time and efforts have been damaging to my focus and motivation (*see Ex. A(9) below*); and (3) the three years since 2022 when I would have graduated with a bachelor's degree and had career opportunities available to me, where I have instead been unemployed after applying to more than 200 jobs at places like Target (*see Ex. C(3) below*).  The theory of irreparable injury derives from *US v. Carroll Towing* (*159 F.2d 169 (2d Cir. 1947)*).  The major object of my claims to federal jurisdiction are the audio recordings of the university proceedings relevant to the *Steffel* precedent (*see Exs. A(6), A(9), A(12), and B(3-6) below*).  Upon trying to return to the university in 2023, I was ignored by the student conduct office for months (*see Ex. A(1) pg. below*); I was told that the student conduct office is responsible for investigating its own wrongdoings (*see Exs. A(5-8) pg. below*); and I was ignored by the university threat assessor for months until he, the student conduct investigator, and the university defense counsel had collaborated to permit me to resume my threat assessment hearing with conditions (s*ee Exs. A(9-11) pg. below*).  The condition for me to return to the university was that I may resume my threat assessment hearing if I do not record the proceeding in violation of the university's policy on procedural due process (*see Ex. A(10 & 11)*).  My "willingness" to resume the university threat assessment procedure, as put by the university defense team, is actually based on university official's willingness to impose the wrongful condition, and not on my alleged "unwillingness" to participate in the process under any circumstances (*see Ex. A(10) below*).  The permanent disciplinary probation (*UC PACAOS 105.03*) upheld by a conflict of interest (*UCWP IV(G)(7)*) disqualifies me from the financial aid I depend on, so I may be able to resume the grievance procedure when the condition against university policy is removed, but even after completing that process, I cannot return to the university until the terms of suspension against university policy

are reversed.  I have repeatedly raised the concern that the Doc. #57 defense and Doc. #67 order were almost exclusively focused on a line of inquiry removed from my case months beforehand in Doc. #16.  Given all of my disclosures and the articulation of them, my claims cannot possibly be "conclusory."

**DECLARATION OF EXHIBIT A(1): INITIAL DELAY OF STUDENT GRIEVANCE PROCEDURE TO RETURN TO UCI BY STUDENT CONDUCT INVESTIGATOR CHRISTOPHER CORONEL IN 2023 (UCI PACAOS 103.11(b) & 171.12)**

The email chain between defendant Chris Cornel and I occurred from September 11th of 2023 to January 28th of 2024 (*Doc. #128 pg. 1-17*).  The terms of my university suspension assign me to a permanent disciplinary probation period and require me to participate in a threat assessment hearing (*see Ex. A(3) below Doc. #128 pg. 28*).  Mr. Coronel initially **denied** my ability to be informed of the scheduling of the threat assessment hearing from September 11th to September 28th of 2023, and he **refused** to answer any of my questions about UC PACAOS 105.03 (*Doc. #128 pg. 1-11*).  UC PACAOS Section 103.11(b) requires "**prompt and fair**" student conduct hearings (*Doc. #126 pg. 21-22*), but eventually **delaying** the resumption of my threat assessment hearing for two months is not prompt or fair (*see Ex. A(10) below Doc. #128 pg. 11-17*).  The content of these communications also corroborate university official's **pattern** of circumventing particular elements in a conversation they evidently intend to avoid, such as the **ignorance** to my inquiry about food safety in dorm housing in 2020 and the seven-month **delay** of my UCI OAISC SCRB appeal hearing in 2021 (*see Ex. B(13) below Doc. #129 pg. 235-236; see Ex. B(2) below Doc. #129 pg. 11-166*).  UC PACAOS Section 171.12 gives all students access to **equitable** grievance procedures established pursuant to university policy (*Doc. #126 pg. 24*), but following a pattern established in 2020 to repeatedly delay grievance procedures is not equitable.  The **injury** that Exhibit A(1) demonstrates is that Mr. Coronel's initial **delays** in scheduling a threat assessment hearing are not **fair, prompt, or equitable**.  The **cause** directly demonstrated by these communications in combination with Exhibits A(3) and A(10) is UCI OAISC Associate Director

Christopher Coronel's means of **refusing** to move forward with the university grievance procedures in violation of the listed UC PACAOS policies.  The attached PACAOS policies also contain emboldened text for additional text provided on the policy page exclusive to UCI.  The **relief** requested from the court under this line of inquiry is to order the UCI OAISC or other appropriate authority to expedite the processes related to my academic hold by lifting the hold immediately (*request for relief 1*).

**DECLARATION OF EXHIBIT A(2): INITIAL CONTACT WITH UCI WHISTLEBLOWER INVESTIGATOR KATHIE ALLEN IN 2023 (UCWP IV(E)(4))**

The first email chain between UCI Whistleblower Office employee Kathie Allen and I occurred from September 12th of 2023 to October 6th of 2023 (*Doc. #128 pg. 18-26*).  On September 13th of 2023, I was told by Mrs. Allen that all of my inquiries fall within the scope of the student conduct office (*Doc. #128 pg. 19*), even though 1 out of 3 of the forms I submitted (*see Ex. B(12) below Doc. #129 pg. 193-194*) as well as 3 out of 5 of the total incidences occurred **before** there were any student conduct issues (*Doc. #127 pg. 12-13 at 5:05*).  On October 5th of 2023 after filing my case in federal court, something apparently changed, and the whistleblower office was more interested in what I would file in a complaint (*see Ex. A(6) below Doc. #128 pg. 51*).  Between September 14th to September 21st of 2023, I had a phone conversation with Anne Parker from Hathaway and Parker which seemed like an investigation of my legal strategy compared to any of the other firms I had contacted (*Doc. #98 pg. 209-211*).  My whistleblower inquiry was not given **serious acknowledgement** from September 13th to October 5th of 2023, and a whistleblower conference was not held until after I informed Dr. Tau that there is pending litigation during my first attempted threat assessment hearing (*see Ex. A(6) below Doc. #128 pg. 51-55*).  A whistleblower investigation can also derive from Regent authority itself according to UC Whistleblower Policy IV(H)(2) (*Doc. #51 pg. 17*).  The purpose of Exhibit A(2) is to corroborate the same **cause** as Exhibits A(6-8) and B(12) below on the topic of whether Kirsten Quanbeck's repeated means of denying "sufficient corroborating evidence of improper

1  governmental activity" violates of UCWP IV(E)(4).  The **relief** I am requesting from the court

2  under this line of inquiry is the same as the first for Exhibits A(7-8) below (*request for relief 3*).

3

4  **DECLARATION OF EXHIBIT A(3): UCI OAISC SCRB FINAL DECISION IN 2020 (US**

5  **CONST AMD. XIV & UC PACAOS 105.03, 105.04, 171.09, 171.11, 171.12)**

6  I was sent my final decision by the UCI OAISC Student Conduct Review Board on July

7  30th of 2021 (*Doc. #128 pg. 27-30*).  The notice assigns me a term of disciplinary probation "for

8  the duration of my academic enrollment" (*Doc. #128 pg. 28*).  PACAOS Section 105.03 requires

9  disciplinary probation of a student to be assigned for a "**specific period of time**" (*Doc. #126 pg.*

10 *22*).  A **permanent** term of disciplinary probation violates UC PACAOS 105.03 and **disqualifies**

11 me from the financial aid which my academic enrollment depends on (*Doc. #128 pg. 31-33*).  The

12 specificness of such a punishment "for the duration of my academic enrollment" is **comparable**

13 to a general and permanent search warrant that enables the search of someone at any time,

14 anywhere, for any reason (*Doc. #128 pg. 2-7*).  UC PACAOS Section 105.04 excludes students

15 on disciplinary probation from **participating in campus activities** for a specific period of time

16 (*Doc. #126 pg. 22*).  A permanent disciplinary probation also "coincidentally" **eliminates** one of

17 my main purposes in education to network with others and bring startup projects to the campus

18 community through the participation in campus activities (*Doc. #128 pg. 2-4*).  According to the

19 policy, Mr. Coronel had to have lied about being "permitted to join campus organizations" on

20 September 14th at 4:50PM (*Doc. #128 pg. 3*).  Furthermore, the assignment of my academic

21 punishments were **based on** lies, omissions, partiality, discrimination, my duress, and negligence

22 by the university (*see Ex. B(1, 3-6, 9, 13) below*).  PACAOS Section 171.09 requires official

23 decisions affecting a student's academic standing to be administered **equitably** (*Doc. #126 pg.*

24 *23*), but a permanent disciplinary probation against university policy is not equitable, and nor is

25 **lying** to influence a student conduct decision (*see Ex. B(1, 3-6, 9) below Doc. #129 pg. 170-171*).

26 The relevance of UC PACAOS Section 171.11 is articulated in Exhibit B(9) below.  The **injuries**

27 that Exhibit A(3) demonstrates are that (1) a **permanent** term of disciplinary probation

28

- 15 -

constitutes a "**specific period of time**" in the same way that a search warrant requires specifics; (2) a **permanent** disciplinary probation is not **equitable**; and (3) my ability to qualify for the financial aid that my academic enrollment depends on is ***irreparably damaged*** by a **permanent** disciplinary probation.  The **cause** directly demonstrated by this notice from the UCI OAISC is that I have been assigned a permanent disciplinary probation that irreparably injures my academic enrollment as a **punishment** in violation of the listed UC PACAOS policies.  Exhibit A(3) also corroborates Exhibits B(2&10) on the topic of whether it is fair, prompt, equitable, or a procedural due process to delay my appeal hearing for seven months while only giving me 7 days to respond before the decision is final (*Doc. #129 pg. 11-166*). The **first** request for relief under this line of inquiry is to order the UCI Office of Academic Integrity and Student Conduct to reverse the term of my disciplinary probation in full immediately (*request for relief 2*).  The **second** request for relief under this line of inquiry is to order the University of California Office of the President, Office of the General Counsel, or other appropriate authority to compensate me a recovery equal to the value of the damages to "CalGrant" financial aid that I qualified for before the events of 2020 (*request for relief 4*).

**DECLARATION OF EXHIBIT A(4): CONTACT WITH UCI OIT IN 2023 (REMOVED FROM CLAIMS IN DOC. #16)**

The email chain between UCI Office of Information Technology employee Jon Haynes and I through UCI OIT software occurred between September 26th of 2023 and September 29th of 2023 (*Doc. #128 pg. 34-38*). These communications demonstrate the final outcome for the original **cause** from which my original complaint stemmed. For the time in September of 2023 before I submitted my complaint until I filed this information in Doc. #16 on September 29th, I was trying to communicate with the OIT by email and not getting a response there.  I withdrew the line of inquiry for being denied access to online university software from my case after the university resolved it themselves (*Doc. #16 pg. 2*).  However, the Doc. #57 defense and Doc. #67 order were focused on this line of inquiry, to the point of omitting other

lines of inquiry, even though it was **removed from my case months beforehand**. The content of my communications with Mr. Haynes also explicitly corroborate a contrast between all of the unusually unnavigable university bureaucracy situations I "coincidentally" keep finding myself in except for this one.

**DECLARATION OF EXHIBIT A(5): 3-MONTH DELAY OF STUDENT GREIVANCE PROCEDURE TO RETURN TO UCI AND SUBJECT TO CONFLICT OF INTEREST IN 2023 (UC PACAOS 171.09 & UCWP IV(G)(7))**

Exhibit A(5) includes my email chains with other UCI OAISC staff from September 8th to September 19th of 2023 (*Doc. #128 pg. 39-41*), the Division of Career Pathways from September 29th of 2023 to October 9th of 2023 (*Doc. #128 pg. 42-47*), and the University Registrar from September 8th to October 2nd of 2023 (*Doc. #128 pg. 50*). The purpose of Exhibit A(5) communications is to demonstrate the resulting outcomes for when I tried to navigated other, potentially relevant university bureaucracy, where I was always told to return my inquiry to the UCI OAISC for them to **investigate themselves**. UC Whistleblower Policy Section IV(G)(7) prohibits **subjects** of a whistleblower investigation from **interfering** with that investigation (*Doc. #126 pg. 24*). I was originally told that the Whistleblower office cannot help me because I have not identified any policy violations, then the answer became the Whistleblower office cannot help me because the UCI OAISC is supposed to **investigate itself** (*see Exs. A(7-8) below Doc. #128 pg. 63-64*). UCI OAISC employees did not respond to my inquiries to investigate the associate director of the office's delays and biases, begin the process related to my disciplinary probation or academic hold, or remove him from my case (*Doc. #128 pg. 1-17, 39-41*). When I asked Mr. Coronel about investigating himself and my other whistleblower inquiries, he had no idea what I was talking about because he is a student conduct investigator (*Doc. #128 pg. 10*). It makes no sense. Exhibit A(5) also corroborates UCI OAISC employees insistence to delay university grievance procedures (*see Ex. B(2) below Doc. #129 pg. 11-166; see Ex. B(13) below Doc. #129 pg. 235-236*). The **injury** demonstrated by all of these communications together is a conflict of

interest for **subjects of an investigation** to investigate themselves.  The **<u>cause</u>** demonstrated by my communications with the UCI offices listed above in combination with Exhibits A(6-8) is that university policy caused those offices to **direct my inquires** about the UCI OAISC back to that office despite its previous **refusals** to take any action upon its own policy issues in violation of the listed UC policies.  The **<u>first</u>** request for relief under this line of inquiry is the same as that for Exhibit A(1) above (*request for relief 1*). The **<u>second</u>** requests for relief under this line of inquiry is the same as that for Exhibits A(7-8) below (*requests for relief 3 and 8*).

**DECLARATION OF EXHIBIT A(6): UCI WHISTLEBLOWER INVESTIGATION SUBJECT TO CONFLICT OF INTEREST IN 2023 W/ AUDIO RECORDING (UCWP IV(E)(4) & IV(G)(7))**

The second email chain between UCI Whistleblower Office employee Kathie Allen and I occurred from October 31st of 2023 to January 11th of 2024 (*Doc. #128 pg. 51-62*).  I will also include my audio recording of the whistleblower conference Kathie Allen on November 17th of 2023 with Exhibit A(6) (*pg. 9 above*).  The Supreme Court unanimously ruled that "exhaustion of state remedies is precisely what would be required if federal injunctive and declaratory relief were unavailable in a case where no State prosecution had been commenced" in *Steffel v. Thompson, 415 U.S. 452, 1974, at 472-473*.  UC Whistleblower Policy Section IV(E)(4) therein requires "**sufficient corroborating evidence**" to justify the commencement of an anonymous university whistleblower investigation (*Doc. #126 pg. 24*).  For example, direct communications with wrongdoers about the wrongdoing in real time would consist of sufficient corroborating evidence if the wrongdoing constitutes any policy violations like those demonstrated in Exhibit B(12) (*Doc. #128 pg. 1-17, 51-62; Doc. #129 pg. 11-166, 170-183, 202-209, 235-236*).  Despite everything I submitted, I was never given a **direct reason** for why those submissions lack sufficient corroborating evidence of improper governmental activity in either whistleblower report (*see Ex. A(7-8) below Doc. #128 pg. 63-64*).  The many unusual events that I experienced on campus in 2020, namely those listed in Exhibit B(13) below, gave me credible fear under

student confidentiality policy to suspect that information from the total possible extent of my whistleblower case would not be used for its **intended purpose** if disclosed before the commencement of a serious investigation (*see UC PACAOS 130.722(b)* *Doc. #126 pg. 22-23*), so I did not include the picture of my former Norcal warehouse boss on the university law school's career office webpage in my whistleblower complaints because I also wanted to see how the whistleblower office would handle smaller matters before releasing the more sensitive materials (*Doc. #127 pg. 12-13 at 5:05*).  UC Whistleblower Protection Policy Section III(E)(1) shifts the burden of proof for student conduct and retaliation cases (*Doc. #126 pg. 25*).  Meanwhile, nothing in the general UC whistleblower policies shift the burden of proof in the case of sufficient corroborating evidence of improper governmental activity, such as for acts in question which have already produced negligent outcomes like in my case (*see Ex. B(13) below* *Doc. #129 pg. 202-209, 235-236*).  The purpose of Exhibit A(6) is to corroborate the same **cause** as Exhibits A(2), A(7&8), and B(12) on the topic of whether the power of the Whistleblower office to refuse to investigate sufficient corroborating evidence of improper governmental activity is **unlimited** in violation of the UC Whistleblower policies listed in Exhibits A(7-8) below.  The **relief** I am requesting from the court under this line of inquiry is the same as that for Exhibits A(7-8) below (*requests for relief 3 and 8*).

**DECLARATION OF EXHIBIT A(7&8): UCI WHISTLEBLOWER REPORTS SUBJECT TO CONFLICT OF INTEREST IN 2023 (UCWP IV(E)(4) & IV(G)(7), WPP III(D)(1)(c) & (III)(D)(4)(d))**

The whistleblower reports from Mrs. Kirsten Quanbeck which I received from Mrs. Kathie Allen on October 25th and November 29th of 2023 were submitted to the court on December 22nd of 2023 (*Doc. #128 pg. 63-64*).  The first **reason** I was given for why my whistleblower case was turned down was that I did not submit "sufficient corroborating evidence of improper governmental activity" (*Doc. #128 pg. 63*).  Then on November 29th, Vice Chancellor of the Division of Equal Opportunity and Compliance, Kirsten Quanbeck, had the second whistleblower

report sent to me that changed the first reason not to move forward with an investigation to 'we don't handle **student conduct matters** even if they are improper' (*Doc. #128 pg. 64*).  The whistleblower reports are especially chilling after the first reason I was given included that **student confidentiality** issues related to **retaliation** "are not a violation of university policy" and then how 3 out of 5 of the totality of issues I raised occurred **before** any student conduct issues had occurred.  The combination of Mrs. Quanbeck's two investigative reports **omit** several critical lines of inquiry including the "unofficial medical diagnosis," investigative conflict of interest, incidents of possible retaliation, and the topic of "sufficient corroborating evidence" altogether to the point where the detail in either does not enable an **independent determination** about whether a policy violation occurred (*Doc. #128 pg. 63-64*).  In addition to the whistleblower policies cited in Exhibits A(5&6) above, UC Whistleblower Protection Policy Section (III)(D)(4)(d) requires that an investigative report be **detailed** enough for the Chancellor to make an independent determination about the quality of the result of the given investigation (*Doc. #126 pg. 24-25*).  UC Whistleblower Protection Policy Section III(D)(1)(c) requires that a complainant be informed of the **deficiencies** in their documents (*Doc. #126 pg. 24*).  However, the reasons given by the Whistleblower office not to investigate my inquiries did not provide me with specific information describing where each of my them **fall short** of "sufficient corroborating evidence" (*Doc. #128 pg. 63-64*), and instead made a series of omissions and distortions including that student confidentiality and retaliation are not policy issues (*see Ex. A(2 & 6) above Doc. #128 pg. 51-62; see Ex. B(13) below Doc. #34 pg. 8-14; Doc. #126 pg. 22-23*). The Chancellor could prospectively not only **not assess** whether a policy violation occurred, but they could also not assess in what ways my submissions fall short of **evidentiary requirements**. The Regents have no alternative policy for whenever one policy itself such as a conflict of interest may prevent another university process from moving forward.  The **injuries** that Exhibit A(7-8) demonstrates are that (1) there are no **limits** on the Whistleblower office's power to **refuse** to investigate sufficient corroborating evidence of improper governmental activity, regardless of whether the acts in question have already produced negligent outcomes; (2) the whistleblower

reports are not **detailed** enough for the Chancellor to assess whether policy violations have occurred; (3) I was not informed of any **deficiencies** where my whistleblower complaints fall short of sufficient corroborating evidence of improper governmental activity; and (4) insistence to prompt a conflict of interest for **subjects of an investigation** to investigate themselves.  The **cause** demonstrated by the whistleblower reports in combination with Exhibits A(2) and B(12) is that they did not provide **direct reasons** for denying sufficient corroborating evidence of improper governmental activity, but instead provided a **prejudicial conclusion** at first and then **misrepresented** the procedural grounds all as student conduct issues in violation of the listed UC Whistleblower Policies.  The **first** request for relief under this line of inquiry is to order the UCI Whistleblower Office or other appropriate authority to initiate an investigation of the sensitive matters mentioned in Exhibit A(6) above which I had not yet released to the whistleblower office (*request for relief 3*).  The **second** request for relief under this line of inquiry is to order the Regents of the University of California, UC Office of the President, or other appropriate authority to develop and implement systemwide general Whistleblower Policy evidentiary standards based on Whistleblower Protection Policy Section III(E)(1) which shall abolish any unlimited power not to investigate a) circumstances that have already produced negligent outcomes in all cases, b) any vague but possible legal issue that consist of a significant hardship, and c) sufficient corroborating evidence of improper governmental activity in all cases (*request for relief 8*).


**DECLARATION OF EXHIBIT A(9): AVOIDANCE BY UNIVERSITY DEFENSE COUNSEL JOHN GHERINI W/ AUDIO RECORDING 2023-2025 (FRCP 8(b)(2), 8(b)(5), 11(b)(4))**

Several email chains and audio recordings between defense counsel John Gherini (*Doc. #128 pg. 65-115*), Raymond Cardozo (*Doc. #128 pg. 116, 119-123*), and Corrine Fierro (*Doc. #128 pg. 117-123*) and I occurred from December of 2023 until June of 2024 (*pg. 9 above*).  The purposes of Exhibit A(9) are to corroborate (1) defense counsel's avoidance of case information in order to project their poor understanding of it as a defense; and (2) the same **cause** demonstrated by

Exhibits A(10-11) below on the topic of whether Mr. Gherini collaborated with Mr. Coronel and Dr. Tau **not to move forward** with university proceedings except to use it as a leverage in the litigation to impose the condition against university policy on **procedural due process** in violation of UC PACAOS 171.09 and 171.12.  After Dr. Tau and Mr. Coronel **ignored** my distressed requests to reschedule a threat assessment during **for months** (*Doc. #128 pg. 12-17*), Mr. Coronel sent me a university notification offering to finally resume the assessment on the same day in December of 2023 as I replied to Mr. Gherini for the first time (*Doc. #128 pg. 14 & 65*).  I have already witnessed more than enough reasons to have to keep audio recordings of university proceedings, and Dr. Tau refused to reschedule the assessment despite my request to reschedule it.  I even attended a Zoom meeting with Mrs. Cardenas in 2020 where I did not keep an audio recording, because I did not feel like I had a need to at that time (*see Ex. B(13) below Doc. #129 pg. 206*).  A private contractor that provides services to a public entity is not a state actor **unless** they are acting on behalf of a public entity, have a close relationship with a public function, or collaborate with a public official (*Rendell-Baker v. Kohn, 457 U.S. 830, 1982 at 840-843*).  The elements of defense counsel's avoidance of case materials are thoroughly described in Doc. #126 (*pg. 5-8*).  Mr. Gherini's avoidance since he received my initial complaint in October of 2023 has compounded the **injury** to my focus and motivation (*see Exs. A(3) above Doc. #128 pg. 31-33; see Ex. C(2) below Doc. #130 pg. 18-21*).  I have been fatiguing myself actively prosecuting my case against an avoidant defense attorney, except for when the moments of lapse after so many failed efforts were swiftly jumped on (*Doc. #126 pg. 6-7; Doc. #68 pg. 1-8; Doc. #83 pg. 1-25*).  A pro se plaintiff whose is being drained spending more time to complete tasks that are simple to a professional defense attorney with less stake in the outcome of the case are not on **equal footing** with each other at all, let along a pro se undergrad student whose focus and motivation was already fatigued before the case began.  Mr Gherini also projected his own avoidances related to the rule 26(f) joint report back at me as if I have not been frequently emailing him to move forward with the process (*Doc. #126 pg. 6-7*).  The nature of Gmail software has contributed greatly to the confusing nature of my Exhibit A(9) filing like that for

Exhibit B(2). The **relief** I am requesting from the court under this line of inquiry is a motion to order the university defense team to cease and desist impeding, impairment, and other avoidance of case information by means of unfair defenses based on a poor understanding of that information, whether intentional or not, in violation of FRCP 8(b)(2), 8(b)(5), 8(c)(1), 11(b)(3), 11(b)(4), and Local Rule 7-18(c) (*Doc. #126 pg. 14-15*).

**DECLARATION OF EXHIBIT A(10): COLLABORATION BETWEEN DEFENSE COUNSEL, STUDENT CONDUCT INVESTIGATOR, AND THREAT ASSESSOR IN 2023-2024 (UC PACAOS 103.11(b) & 171.12)**

I was sent an official notification by the UCI OAISC email address on December 12 of 2023 (*Doc. #128 pg. 14*), after months of not receiving any replies from Christopher Coronel, Dr. Manny Tau, or anyone else affiliated with UCI OAISC as demonstrated between Exhibits A(1, 5, 11) (*Doc. #128 pg. 1-17*). I did not receive this notice from Mr. Coronel to finally resume the university grievance procedure **until** December 12th of 2023, who conveniently **waited** since October until the very same day Mr. Gherini and I had sent communications back and forth for the first time (*Doc #128 pg. 65*). Mr. Coronel could have gotten back to me about any delays in the scheduling of my threat assessment during October or November of 2023, but instead waited until that **one particular day** on which Mr. Gherini and I first exchanged correspondence, only as if to be boldly displaying a well-established pattern of delays. Before the first attempted threat assessment, Mr. Coronel said I should expect a call to schedule it "anytime this week" in late September, which never ended up happening that week (*Doc. #128 pg. 10*). Mr. Coronel's notice establishes a **condition** that I may only resume my threat assessment hearing if I do not keep authentic **evidence** of its contents (*Doc. #128 pg. 124*). The bold timing of the OAISC's willingness to finally move forward with the grievance procedure is an attempt by the university only to do so in order to use it as a leverage in the litigation to impose the condition against university policy on **procedural due process**. When I asked Dr. Tau a question, he learned that I was keeping an audio recording and asked if I want to end the threat assessment after accusing me

of being "adversarial."  However, after being subjected to Mr. Coronel's lies that influenced my suspension, any reasonable person would keep audio recordings of official proceedings in case any facts may require **authentic proof** later on.  **Delaying** the resumption of my threat assessment hearing until the opportunity to use it as leverage in a lawsuit is not an **equitable** university grievance procedure (*Doc. #128 pg. 14, 65-66, 124*).  Mr. Gherini even stated that I am not willing to resume the threat assessment [under any circumstances] (*Doc. #81 pg. 2*), which is irritatingly false as demonstrated by my distressed attempts to resume the process in my emails with Mr. Coronel (*see Ex. A(1) above Doc. #128 pg. 15-16*).  It's hard for the defense to reasonably characterize my "willingness" to resume the university grievance procedures like they have, after projecting the cause of not moving forward with the processes by using the condition against university policy back at me as if keeping an audio recording after **everything I had already documented** somehow shows that I am doing wrong.  The **injury** demonstrated by Exhibit A(10) is Mr. Coronel's collaboration with Mr. Gherini and Dr. Tau not to move forward with university proceedings except with an **inequitable** condition that violates university policy on **procedural due process**.  The **cause** demonstrated by this official university notice from the UCI OAISC in combination with Exhibits A(1, 5, 9, 11) is the **two-month delay** that occurred before I received a reply about resuming the threat assessment hearing.  Exhibit A(10) also corroborates the same **cause** as Exhibit A(9) on the topic of whether Dr. Tau is a state actor (*Rendell-Baker v. Kohn, 457 U.S. 830, 1982 at 840-843*).  The **relief** I am requesting from the court under this line of inquiry is the same as the first for Exhibits A(1 & 3) above (*requests for relief 1 and 2*).


**DECLARATION OF EXHIBIT A(11): CONTACT WITH UNIVERSITY THREAT ASSESSOR DR. MANNY TAU IN 2023 (US CONST AMD. XIV & UC PACAOS 103.10)**

The email chain between Dr. Manny Tau and I occurred from September 29th of 2023 to October 11th of 2023 (*Doc. #128 pg. 125-129*).  Dr. Tau and Mr. Coronel **never replied to** my distressed requests to resume the threat assessment (*Doc. #128 pg. 12-13, 15-16, 128-129*).  According to

Mr. Gherini, Mr. Coronel is also a professional threat assessor if he did not mix up Mr. Coronel and Dr. Tau by describing the functions of Dr. Tau's role using the words "a university investigator" and "the university investigator" (*Doc. #57 pg. 4, 10, 13, 14, 16*).  The only functional purpose for the UCI OAISC to request Dr. Tau's services for my case is to hide behind the private contract, so they can go out of their way to try to demand that I do not keep audio recordings of the proceeding.  The delay between October and December was also a period of time long enough for Mr. Gherini, Mr. Coronel, and Dr. Tau to collaborate on how to approach my case (*see Ex. A(9&10) above*).  Because Dr. Tau is a **state actor** either way, the university should **accept service** on behalf of him (*Rendell-Baker v. Kohn, 457 U.S. 830, 1982 at 840-843*). The **injury** and **cause** demonstrated by Exhibit A(11) are identical to those expressed in Exhibit A(10) above.  The **relief** I am requesting from the court under this line of inquiry are the same as the first for Exhibits A(1 & 3) above (*requests for relief 1 and 2*).

**DECLARATION OF EXHIBIT A(12): AUDIO RECORDING OF THREAT ASSESSMENT HEARING IN 2023 (US CONST AMD. XIV & UC PACAOS 103.10)**

Exhibit A(12) will consist of an audio recording of my attempted threat assessment hearing with Dr. Manny Tau on October 10th of 2023 (*pg. 9 above*).  Under *Steffel*, Exhibit A(12) and my TRO applications are major objects of my claim to federal subject matter jurisdiction because Dr. Tau accused me of committing a "crime" (**CPC 632**) if I did not stop recording the threat assessment hearing, even though I had documented plenty of reasons to keep audio recordings of university proceedings before that moment (*Doc. #127 pg. 20 at 1:06:40-1:08:19*).  UC PACAOS Section 103.10 requires that the accused have an opportunity to **respond to the evidence** as a condition of "procedural due process" (*Doc. #126 pg. 21*).  Evidence which I have documented, namely in Exhibits B(3-6) below, leads to the conclusion that other, pattern-like abuses would have continued if I could not keep audio recordings of the proceeding for proof of its context. With all substantial certainty, Dr. Tau's intent was to stop me from keeping audio recordings during the proceeding by inciting fear in me with the threat of punishment.  The **injury**

demonstrated by Exhibit A(12) is that I was denied the future opportunity to **respond to the evidence** because there is no other way of proving the context of the threat assessment hearing. The **cause** directly demonstrated by my audio recording of the threat assessment hearing is Dr. Tau's **threat in bad faith** to the use the force of criminal law in a university proceeding in violation of UC PACAOS Section 103.10 and ***State due process***.  My claims related to Dr. Tau could also be characterized as an official act to deny civil rights under the color of law related to intimidation and coercion in violation of 18 U.S.C. 242.  The **first** requests for relief are the same as the first for Exhibits A(1 & 3) above (*requests for relief 1 and 2*).  The **second** request for relief under this line of inquiry is to order the Regents of the University of California, UC Office of the President, or other appropriate authority to develop and implement a systemwide PACAOS policy a) permitting the keeping of video and audio recordings of non-class-related official university activities; and b) prohibiting the use, threat of use, or implied invocation of criminal statutes in bad faith in official university proceedings (*request for relief 7*).

**DECLARATION OF EXHIBIT B(1): UCI OAISC SCRB APPEAL PROCEEDING IN 2021 (US CONST AMD. XIV & UC PACAOS 171.11 & 171.12)**

Exhibit B(1) consists of the appeal document I submitted to the UCI OAISC in 2021 in my communications with Dean Rameen Talesh (*Doc. #129 pg. 1-10*).  My university appeal document lead to the result in the Exhibit A(3) UCI OAISC SCRB final decision.  The listed "Exhibits A-D" therein are oriented towards the events that led to my suspension (*Doc. #129 pg. 5-10*), but "Highlighted Exhibit E" therein consists of a rough version of a timeline of the Exhibit B(3) audio recording of my first suspension hearing with Mr. Coronel (*Doc. #129 pg. 1-4*).  My university appeal document alleges at least ten **lies** by Mr. Coronel that influenced my student conduct case, best demonstrated by the Exhibit B(3) audio recording (*Doc. #127 pg. 2-9*).  My second and third dispute with the final suspension notice in that timeline has to do with the misrepresentation of whether "I felt" there was an urgent threat to my safety (*Doc. #129 pg. 2*), which I did and Mr. Coronel **represented** that I did not.  During my first suspension hearing, Mr.

Coronel asked me about urgent safety concerns related to the unknown condition of my food (*see Ex. B(3) Doc. #127 pg. 7 at 1:03:42-1:05:50*). No reasonable person could possibly know what else may have happened to their food if it was being **moved around** by someone else when they cannot see, and potentially tampered-with food would have the same effect no matter when I ingest it like Mr. Coronel asked about.  Mr. Coronel follows at that time by posing a hypothetical where someone was instead tampering with my food **while in front of me** (*at 1:03:00-1:04:00*). The hypothetical Mr. Coronel posed is beyond oblivion because a person who desired to tamper with food would not do it in front of their intended victim.  In Mr. Coronel's determination, only food-tampering done in front of the victim would qualify as a food safety hazard, but not if a) I know my food is being moved around in the dorm fridge, b) whether I **do not know** if anything else has happened to my food, and c) whether I have a probable suspect based on **reported behaviors** in the dorm (*Doc. #129 pg. 235-236*).  I go on to be questioned by Mr. Coronel about a hypothetical situation where he insisted that I must have kicked Kidra from the ground while being kneed in a headlock, which would be **impossible**, before "torquing" his leg in order to escape (*Doc. #127 pg. 5-6 at 38:13-50:47*).  I was put on the ground and kneed in the face up to 20 times, but that was not mentioned in my final suspension notice even though Mr. Coronel repeated it back to me (*see Ex. B(3) Doc. #127 pg. 6 at 48:10*).  Mr. Coronel even **characterized** my escape from the headlock as the hostile act in that instance (*Doc. #127 pg. 5 at 38:13*).  How can official university decisions based on lies and partiality possibly be **equitable** (*Doc. #129 pg. 1-4*)?  The **injury** and **cause** demonstrated by Exhibit B(1) are identical to those expressed in Exhibits B(3-6) below.  The **first** request for relief under this line of inquiry is the same as the first for Exhibits A(1 & 3) above (*requests for relief 1 and 2*). The **second** request for relief under this line of inquiry is the same as that for Exhibit A(12) above *(request for relief 7)*.

**DECLARATION OF EXHIBIT B(2): 7-MONTH DELAY OF STUDENT GRIEVANCE PROCEDURE BY UCI OAISC EMPLOYEE ANH PHAM IN 2021 (UC PACAOS 103.11(b) & 171.12)**

The email chain between UCI OAISC employee Anh Pham and I occurred from January 8th of 2021 to July 29th of that year (*Doc. #129 pg. 11-166*).  According to Mr. Pham in June of 2021, the delay in the appeal hearing was due to a lack of availability on the schedule (*Doc. #129 pg. 63*), but the **circular** nature of my conversation with him over the months previous since January of 2021 instead demonstrates a knowing and willful intent to cause a seven-month delay (*Doc. #129 pg. 11-62*).  First, Dean Talesh made a statement from about the Student Conduct Review Board's role in the process "from the beginning" that drew me into a **distracting** line of questions on January 25th of 2021 (*Doc. #129 pg. 172*).  Then on May 17th of 2021 at 9:55AM, he wrongly quoted me as making the "initial usage" of the redundant statement on January 25th when he said that the idea was "sourced from your question on April 25-27," while **contradicting** himself when he correctly identified the "initial usage" of the redundant statement as Dean Talesh's in the very same email (*Doc. #129 pg. 17*).  It is as if Mr. Pham was only making such contradictions of himself as a means to **distract** from the actual process at hand (*Doc. #129 pg. 18*).  Mr. Pham previously told me that he was arranging a hearing for February of 2021 (*Doc. #129 pg. 11*), but then did not get back to me again until the end of March after I had replied to him a second time (*Doc. #129 pg. 12*).  The **injury** demonstrated by Exhibit B(2) is that **delaying** my appeal hearing for seven months while only giving me 7 days to respond before the decision is final is not **prompt, fair, or equitable**.  The **cause** demonstrated by my emails with Mr. Pham is the patternlike behavior of UCI OAISC staff to circumvent inquiries they intend to avoid in order to excuse long **delays** of grievance procedures in violation of UC PACAOS Section 103.11(b) and 171.12.  The nature of Gmail software has contributed greatly to the difficulty of navigating my Exhibit B(2) filing.  The **relief** I am requesting from the court under this line of inquiry is the same as that for Exhibit A(1) above (*request for relief 1*).

**DECLARATION OF EXHIBIT B(3-6): AUDIO RECORDINGS OF STUDENT CONDUCT HEARINGS IN 2020 (US CONST AMD. XIV & UC PACAOS 103.05, 103.10, 171.09, 171.11, 171.12)**

Exhibits B(3-6) will consist of my audio recordings of my student conduct hearings with Christopher Coronel (*Doc. #127 pg. 2-12*).  As illustrated in Exhibit B(1) above, I stated how I was kneed in the face up to 20 times, but Mr. Coronel **falsely equivocates** this as "knees were thrown" (*Doc. #127 pg. 5 at 38:13*), and he even proclaimed that my escape from a headlock on the ground was a hostile act (*Doc. #127 pg. 5 to 39:47*).  Mr. Coronel knew that **lying** to influence my student conduct case was not within the scope of his duties, and that **preventing** me from keeping an audio recording would prevent me from proving the lies.  Exhibit B(4) is a major object of my claim to federal jurisdiction because Mr. Coronel demands that I must **stop** recording the proceeding, even though so many bureaucratic issues which occurred on campus before that moment in 2020 gave me specific reasons to think I should keep audio recordings of university proceedings (*Doc. #127 pg. 4 at 33:47-34:29*).  The unusual events on campus in 202 reported to the whistleblower office leads to the conclusion that other, **pattern-like** abuses would have continued if I could not keep audio recordings of the proceeding for proof of its context (*see Ex. B(12) below Doc. #129 pg. 193-201*).  How else could I **prove** the substance of my Exhibit B(1) university appeal document?  Exhibit B(3) was taken during my first hearing on Thursday December 3rd, 2020, and is 1 hour and 58 minutes long (*Doc. #127 pg. 2-9*).  Exhibit B(4) was taken during my second hearing on Wednesday December 16th, 2020, and is 34 minutes and 29 seconds (*Doc. #127 pg. 9-11*). Exhibit B(5) was taken during my second hearing after Mr. Coronel had asked me to stop recording him upon informing him, but the discussion led me to resume recording shortly thereafter for another 14 minutes and 32 seconds (*Doc. #127 pg. 11*). Exhibit B(6) was taken during my final suspension hearing on January 5th, 2021, and it lasted for 17 minutes and 47 seconds (*Doc. #127 pg. 11-12*).  Exhibits B(4&5) were recorded **from** a public parking lot during **finals** week (*Doc. #127 pg. 11 at 8:00*).  Mr. Coronel's unusually **partial** lies directly led to the permanent disciplinary probation that **disqualifies** me from financial aid, and they open a second line of inquiry of "effective expulsion" completely unrelated to the first one removed from my case in Doc. #16 but still defended against in Doc. #57 and judged in Doc. #67. The **injuries** demonstrated by Exhibits B(3-6) is that Mr. Coronel made an **inequitable**

suspension determination that led to ***irreparable damage*** to my ability to qualify for the financial aid that my academic enrollment depends on based on lies, omissions, partiality, my **duress**, and university negligence.  The **cause** directly demonstrated by my recordings of the student conduct hearings is that the OAISC associate director was assigned to my case to lie up to ten times in order to influence my student conduct case and prevent me from proving it in violation of UC PACAOS Sections 103.05, 103.10, 171.12, and ***State due process***.  My Amd. XIV claims could also be characterized as official acts to deny civil rights under the color of law in violation of 18 U.S.C. 242.  The **first** request for relief under this line of inquiry is the same as those for Exhibits A(1 & 3) above (*requests for relief 1, 2, and 4*). The **second** request for relief under this line of inquiry is the same as that for Exhibit A(12) above (*request for relief 7*).

**DECLARATION OF EXHIBIT B(7): ACCESS TO FINAL SUSPENSION REPORT**

Exhibit B(7) currently consists of a screenshot from my computer when I try to access my final suspension notice from December of 2020 using university software (*Doc. #129 pg. 167*).  The exhibit will consist of the actual notice sent to me by the UCI OAISC (*Doc. #37*).  Alongside being a rough timeline for the Exhibit B(3) audio recording, Exhibit B(1) cites of parts of the Exhibit B(7) final suspension notice where Mr. Coronel's specific lies can be **observed** in combination with the audio (*Doc. #129 pg. 1-4*).  In the Exhibit B(3) audio recording, I begin to describe how I stopped Kidra from kneeing me in the face many times over (*Doc. #127 pg. 4 at 38:18-39:47*).  Mr. Coronel made his **determination** partly based on Kidra's "I wouldn't do anything like this" outburst which he "did something like that" made after he **escalated** the situation, which is my FIRST dispute against the final suspension notice (*Doc. #129 pg. 1*).  Mr. Coronel states that "the actions of Party 1 seemed to indicate he did not want to engage as he **stated**" in the fifth paragraph of the "Findings" section of the Exhibit B(7) final suspension notice.  However, the fight began with Kidra suddenly attacking after saying "don't touch me" when I tried to get his attention about the food safety issue because the university was **ignoring it**.  The way Mr. Coronel phrased Kidra's highlighted outburst about his supposed **intent** not to

"ever do anything like this" after the fact of "doing something like that" is indicative of an extreme level partiality, and he made an official determination based on this partiality (*Doc. #127 pg. 5 at 38:13-39:47*).  I go on to describe what I did when I got Kidra to the ground, which is when he made his outburst.  Kidra's expressed desire to deescalate within the timing of events shows that it was a false statement, but Mr. Coronel determined that it was a genuine statement even though he is the party who escalated the situation, just because he said he "did not want to" after the fact *(see Ex. B(3) Doc. #127 pg. 6 at 40:29-42:10*).  Mr. Coronel did not separate Kidra's "real actions" from "what he said his intent was after the fact" in his official determination, so Mr. Coronel took sides with the party who escalated the situation by assuming Kidra did not do the thing he did after doing so (*Doc. #129 pg. 1*).  The police photos of each of our injuries would demonstrate Kidra's lopsided level of force and escalation during the fight, but they were not included with the police report (*see Ex. C(1) below Doc. #130 pg. 1-11*).  The police photos of each of our injuries would demonstrate Kidra's lopsided level of force and escalation during the fight, but they were conveniently not included with the police report.  The **injury** and **cause** demonstrated by Exhibit B(7) are identical to those expressed in Exhibits B(3-6) above.  My skull also suffered ***irreparable damage*** that can only be proven using past photos.  The **first** request for relief under this line of inquiry is the same as those for Exhibits A(1 & 3) above (*requests for relief 1, 2, and 4*). The **second** request for relief under this line of inquiry is the same as that for Exhibit A(12) above (*request for relief 7*).

**DECLARATION OF EXHIBIT B(8): CORROBORATION OF LOSS OF OPPORTUNITY**

Exhibit B(8) will consist of the letter I got from the UCI Career Opportunities office as well as materials obtained from my UCI "Handshake" hiring software account (*Doc. #129 pg. 168-169; Doc. #37*).  Due to these Exhibit B(8) materials revealing a rare "hired" response to a job application I submitted somewhere in 2020, the purpose of their submission is simply to corroborate my financial situation, the losses of opportunity, and compounded stresses on my young-adult life that this case has resulted in.  The **injury** and **cause** demonstrated by Exhibit

B(8) are identical to those expressed in Exhibit C(3) below.  The **<u>relief</u>** I am requesting from the court under this line of inquiry is the same as the second and third for Exhibit B(13) below (*requests for relief 5 and 6*).


**DECLARATION OF EXHIBIT B(9): STUDENT CONDUCT ENTRAPMENT BY ABUSE OF QUARANTINE PROCEDURE IN 2020 (UC PACAOS 103.11(b), 171.09, 171.11, 171.12).**

The email chain between Dr. Rameen Talesh and I occurred from December 14th of 2020 to December 17th of that year (*Doc. #129 pg. 170-183*).  On December 4th of 2020, Mr. Coronel removed my student housing privileges (*Doc. #127 pg. 9 at 1:56:50-1:58:49*), and then I was temporarily placed me in quarantine housing in the weeks leading up to finals (*Doc. #50 pg. 69-76*).  Then, I was removed from quarantine housing (*see Ex. B(11) below*).  UC PACAOS Section 171.11 "frees" students from university discipline for actions committed while under duress (*Doc. #53 pg. 6*).  I was then in a position where I could either try to pay for more than two weeks of accommodation expenses which was a period of time unknown to me at the time, repeatedly drive a car that needed wheel bearings up the length of the State, or return to my dorm out of **duress**.  Someone also told me that the fumes from my car smelled as if fuel was leaking into the oil, but I never had this verified.  I did not contact Dean Talesh to articulate the circumstances until ten days later, but he nevertheless **insisted** continuation of the unofficial punishment by extension to impose that duress.  Unlike in a normal student conduct case, the terms of the interim suspension assigned by Mr. Coronel placed me in a position of duress, and I felt that it was appropriate to contact Dean Talesh to step in.  I ended up spending time sleeping in my car and participating in my second hearing from a parking lot with internet during the week leading up to **finals** (*see Ex. B(5) Doc. # pg. 11 at 7:56-8:30*).  Most importantly, I was **never given a time** to expect when I can retrieve my property, leaving the possible amount of accommodation expenses unknown to me (*Doc. #41 pg. 17-24*).  I eventually learned that my parents have a friend in San Diego, so ended up staying there for the remainder of my wait after a

brief hotel stay.  The **injury** demonstrated by Exhibit B(9) is that I was not free from punishment for returning to student housing instead of driving back and forth to Lake Tahoe in a **relatively dangerous** car several times or paying an **unknown** amount of accommodation expenses while waiting for the university to release my property to me during finals (*Doc. #41 pg. 17-20*).  The **cause** demonstrated by my communications with Dean Rameen Talesh is that he **did not take any action** related to Mr. Coronel's punishment that placed me in a position of **duress** in violation of the listed UC PACAOS policies.  My academic punishment for acts committed while under duress is what gave rise to my previous request for relief related to the Las Lomas Apartment Complex in Doc. #42.  The **relief** I am requesting from the court under this line of inquiry is the same as those for Exhibits A(1, 3, 7, 8) above (*requests for relief 1-4 and 8*).

**DECLARATION OF EXHIBIT B(10): NOTICE FOR UCI OAISC SCRB APPEAL PROCEEDING IN 2021 (UC PACAOS 103.11(b) & 171.12)**

I was sent an official notification by the UCI OAISC email address from Christopher Coronel on July 30th of 2021 which contained a link to the final appeal decision shown in Exhibit A(3) (*Doc. #129 pg. 184*).  The email shows a date indicating that I was only given seven days to reply to the appeal decision before it was finalized, after my appeal was not scheduled for seven months after a circular, seven-month conversation about trying to schedule it (*Doc. #129 pg. 11, 17, 63, 130*). The purpose of Exhibit B(10) is to corroborate the same **cause** as Exhibit B(2) on the topic of whether it is **prompt, fair, or equitable** to excuse a seven-month delay of a university proceeding after a **circular** conversation which lasted just as long in violation of the listed UC PACAOS policies.  The **relief** I am requesting from the court under this line of inquiry is the same as those for Exhibits A(1 & 3) above (*requests for relief 1, 2, and 4*).

**DECLARATION OF EXHIBIT B(11): CORROBORATION OF ABUSE OF QUARANTINE PROCEDURE IN 2020 I (UC PACAOS 171.11)**

The email chains between university officials involved with temporarily placing me in quarantine

housing and I occurred from December 4th to 10th of 2020 (*Doc. #129 pg. 185-192*).  Exhibit

B(11) will consist of an audio recording between an unknown UCI contact tracing employee and I

on December 4th of 2020 (*pg. 9 above*).  I am not entirely sure whether the contents of Exhibit

B(11) will show an **injury**, so I decided they should be declared.  The communications and audio

demonstrated by Exhibit B(11) corroborate the same **cause** as Exhibit B(9).  I even received

another email warning me about my "contact tracing status" on January 6th of 2021, two weeks

after I retrieved my property and left campus on December 19th of 2020 (*Doc. #50 pg. 185-187*).

The many unusual events that I experienced on campus in 2020 would lead any reasonable person

to suspect that I was not truly found to have come in contact with someone with the virus at that

time, and I was placed in quarantine housing with all substantial certainty as a means to reduce

my punishment under duress of " returning to student housing instead of driving back and forth to

Lake Tahoe in a relatively dangerous car several times or paying an unknown amount of

accommodation expenses while waiting for the university to release my property to me during

finals" for one week.  The **relief** I am requesting from the court under this line of inquiry is the

same as the second for Exhibit A(7-8) above (*request for relief 8*).


**DECLARATION OF EXHIBIT B(12): WHISTLEBLOWER COMPLAINT FORMS IN 2023 (UCWP IV(E)(4) & IV(G)(7))**

On October 6th of 2023, I submitted three whistleblower complaint forms to Mrs. Kathie Allen

and a timeline of events I kept in real time in 2020 (*Doc. #129 pg. 193-201*).  I also submitted the

relevant exhibits that have been filed in this case alongside my whistleblower complaints (*See

Exs. A(1 & 5) & B(1, 3-6, 9, 13)*).  Despite the great volume of evidence that sufficiently

corroborated the **negligence** that resulted from two of Janet Cardenas' official university

decisions, and everything else, my whistleblower case was turned down a second time because it

was all **wrongly** grouped as "a student conduct matter" (*Doc. #128 pg. 63*).  The expectation even

seems to be that the student conduct office must conduct a whistleblower investigation on itself,

which violates UC Whistleblower Policy Section IV(G)(7) (*see Exs. A(5-8) above*).  I included

my Exhibits A(1&5) & B(13&14) conversations with Mr. Coronel, Mrs. Cardenas, Mrs. Bouchereau and more in my whistleblower materials (*Doc. #128 pg. 54-55*).  My whistleblower inquiry was also not seriously acknowledged until after I informed Dr. Tau that there is litigation pending during my first attempted threat assessment hearing, (*see Exs. A(7-8) above Doc. #128 pg. 26 & 51*).  The **injury** and **cause** demonstrated by Exhibit B(12) are identical to those expressed in Exhibit A(7-8) above, and the **relief** requested from the court under this line of inquiry are the same as those for Exhibits A(7-8) above (*requests for relief 3 and 8*).

**DECLARATION OF EXHIBIT B(13): BREACH OF UNIVERSITY DORM HOUSING DUTY OF CARE BY JANET CARDENAS IN 2020 (159 F.2d 169 (1947), UC PACAOS 102,09, 104.90, UC GDH G(4)(a))**

The email chains between Janet Cardenas and I occurred from October 7th to 27th of 2020 and then from November 22nd to 27th of that year (*Doc. #129 pg. 202-209, 235-236*).  Mrs. Cardenas put me in contact with Mrs. Bouchereau in association with **mental health counseling** on October 27th of 2020, which I did not know at the time, and I instead thought my retaliation inquiry was being taken seriously as an **investigative matter** rather than being treated like a mental health situation (*Doc. #129 pg. 210*).  Then, on November 22nd of 2020, one of my roommates began **manipulating my food** in the dorm fridge without permission, and Mrs. Cardenas **did not respond** in time before I was **assaulted** several days later (*Doc. #129 pg. 235-236*).  Forwarding my inquiry to an Office of Equal Opportunity and Diversity official who could **separate** me from a problem roommate whom I told Mrs. Cardenas about instead of **ignoring** me was exclusively **under her control** as a university student housing resident life coordinator (*Doc. #126 pg. 25-26*), likewise to when she assigned my previous inquiries to a mental health counselor instead of a whistleblower investigator (*Doc. #129 pg. 210-234*).  Section G(4)(a) of the UCI Guidelines on Discrimination and Harassment enables the OEOD to **separate** students from each other or otherwise "**provide for safety**" for reasons related to **harassment** (*Doc. #126 pg. 25-26*).  UC PACAOS Sections 102.09 & 104.90 prohibit and enhance university

- 35 -

punishments for discrimination against an actual or **perceived member** of a protected class such as a wrongly perceived mentally ill person (*Doc. #126 pg. 21-22*).  Yet, Mrs. Cardenas still **discriminated** against my inquiries after making prejudicial conclusions about them and my character to the point of **leaving me to my own devices** to try to handle a problem roommate who was manipulating my food in the dorm fridge (*Doc. #129 pg. 205-209, 235-236*).  Mrs. Cardenas' **official decision** and **dereliction of duty** led to the events resulting in my suspension, and they are major objects of my claim to federal subject matter jurisdiction because they directly led to *irreparable damage* to my **financial aid qualifications** that I spent my entire **young-adult life** earning a double major to achieve (*see Ex. A(3) above Doc. #128 pg. 31-33; see Ex. C(2) below Doc. #130 pg. 18-21*).  My skull was also *irreparably damaged* as a result of the assault (*see Ex. C(1) below*).  Mr. Coronel stated that Mrs. Cardenas was off duty at that time during my first suspension hearing (*see Ex. B(3) above Doc. #127 pg. 4 at 33:36-34:47*), but I did not get an "out of office" automatic reply at that time like I did from her inbox before (*Doc. #129 pg. 256-257*).  "Out of office" automatic replies are sent automatically through university software when an employee is off duty, so Mr. Coronel's determination in my suspension investigation based on the notion that Mrs. Cardenas was off duty constitutes another lie not included in Exhibit B(1) which I did not know about at that time.  Even if Mrs. Cardenas was off duty, *US v Carroll Towing 159 F.2d 169 (1947)* is inclusive of negligence as a result of absence as well as **direct inaction** (*at 172 p.3*).  Furthermore, Mr. Gherini stated that Mrs. Cardenas is no longer an employee of the university in 2023 (*Doc. #80 pg. 6 & Docs. 77, 87, 90 pg. 2-3, 12*).  Regardless of whether Mrs. Cardenas is an employee of the university at this time, she was at the time of the cause at issue, therefore the university should **accept service** on her behalf.  Furthermore, the assignment of my academic punishments following the events as a result of Mrs. Cardenas' **negligence** were based on lies, omissions, partiality, discrimination, my duress, and negligence by the university (*see Ex. B(1&3-5) above*).  I also included my communications with Thais Bouchereau from October 27th to November 2nd of 2020 (*Doc. #129 pg. 210-234*) and with Officer Bautista from November 27th to December 28th of 2020 (*Doc. #96 pg. 237-255*) in Doc. #50, and I submitted job

applications related to the damages as articulated in the joint report (*Doc. #98 pg. 27-199; Doc. #121 pg. 41-235; Doc. #130 pg. 22-76*).  The nature of Gmail software has contributed greatly to the confusing nature of my Exhibit B(13) filing like that for Exhibit B(2).  The **injury** demonstrated by Exhibit B(13) is Arroyo Vista Resident Life Coordinator Janet Cardenas' **refusal** to intervene in the student housing food safety issue.  The **causes** demonstrated by Exhibit B(13) in combination with Exhibit A(3) above and C(3) below are that Mrs. Cardenas a) breached the **duty of care** in UC GDH G(4)(a) to intervene by failing to begin the process of separating me from a problem roommate within her knowledge; b) did not have the authority to make an effective medical diagnosis **instead of** launch an investigation based on her own judgment, and c) denied my right to ***life, liberty, and property*** by contributing to ***irreparable damage*** to my academic and free time spent during all of my twenties in order to qualify for the financial aid that my academic enrollment depends on (*Doc. #128 pg. 31-33*). The **first** requests for relief under this line of inquiry is the same as those for Exhibits A(1, 3, 7, 8) above (*requests for relief 1-4 and 8*). The **second** request for relief for this line of inquiry is to order the University of California Office of the President, Office of the General Counsel or other appropriate authority to compensate me a recovery equal to a value representative of the damages as a result of my outcomes of hardship as articulated in Doc. #90 pg. 7 (*request for relief 5*).  The **third** request for relief under this line of inquiry is to order the University of California Office of the President, Office of the General Counsel, or other appropriate authority to release to me all academic materials from my "course wishlist" (*request for relief 6*).

**DECLARATION OF EXHIBIT C(1): IRREPARABLE DAMAGE TO SKULL (159 F.2d 169 (1947))**

4 photos of my forehead before 2020 (*Doc. #130 pg. 12-15*), 2 photos of my forehead after 2020 (*Doc. #130 pg. 16-17*), and the UCI campus police report (*Doc. #130 pg. 1-11*) shall be included as Exhibit C(1).  Before November 27th of 2020, the two forward sides of my skull were shaped flat like a normal skull.  After being **kneed in the face about 20 times** when I was attacked by

my dorm roommate, my skull became noticeably misshapen.  I noticed the permanence of this result on my skull after the swelling on my head subsided during December of 2020, which is especially noticeable on the left side of my face **where the worst swelling was**.  The current shape of my skull after 2020 is a direct result of being kneed in the face up to 20 times.  However, the photos do not noticeably demonstrate the injury that is more **visible in person**.  The **injury** demonstrated by Exhibit C(1) materials in combination with Exhibits B(1&3) is ***irreparable damage*** to my skull.  The **cause** that Exhibit C(1) demonstrates is whether each side of my skull on my forehead had protruding, uneven edges before I was kneed in the face about 20 times in 2020 in violation of ***State due process***.  I cannot get the shape of my skull back.  The **relief** I am requesting from the court under this line of inquiry is the same as the second and third for Exhibit B(13) above (*requests for relief 5 and 6*).


**DECLARATION OF EXHIBIT C(2): TESTIMONIALS OF FOCUS AND MOTIVATION, COMMUNITY COLLEGE TRANSCRIPTS (159 F.2d 169 (1947))**

Testimony from 12 or more witnesses to my well-being shall be included as Exhibit C(2).  My community college transcripts are also included as Exhibit C(2) (*Doc. #130 pg. 18-21*).  Aside from hobbies, the witnesses can testify to how the events of the last four years have harmfully impacted my focus and motivation generally in **communicating** and **completing basic tasks** in everyday life.  Even just focusing enough on something like effective proofreading or eating has been hard for me in recent years.  When I make claims related to "hobbies," I will stick to the two most **serious** ones.  Before my young-adult aspirations that are illustrated by Exhibit C(2) materials below, my lifelong childhood aspirations were to play professional baseball.  The norms of going to college caused me to focus more on, develop, and become more focused on fallback plans during the period of my young-adult life.  Upon arriving at the UCI campus in fall of 2020, my plan was to try out for the baseball team because I was still practicing pitching consistently at that time.  Ultimately, the defective suspension with all substantial certainty has put the final nail in the coffin to completely **cut me off** from these extremely limited opportunities which I had

spent my **entire life** working up to. Since 2020, the consistency by which I practice my pitching has fallen apart for a variety of reasons. For example, I have become very interested in the relatively undeveloped science behind precious metals, and I have a huge business plan to "turn the State around." Up at Lake Tahoe, I happen to live sandwiched between the Mother Lode region and Comstock Lode region. Wow! I can give great credit to how the opportunities in precious metals in today's world have not gone away, especially in the State of Nevada. I have taken excellent 101 notes, but the problem is I feel to **subdued** right now to apply my knowledge. I should be, not playing with "hobbies," but engaging in the necessary study to start turning our State around and everything else right now. The crippling **lack of opportunities** for me and many others are killing me and many others. I have **too much to offer** to go to waste, and the causes of all the "unusual coincidences" are may even be attempts to produce this exact kind of damage to what I have to offer the world. The **_injury_** and **_cause_** that Exhibit C(2) demonstrates is identical to those expressed in Exhibit C(4) below. I cannot get the years lost during my entire twenties back. The **_relief_** I am requesting from the court under this line of inquiry is the same as the second and third for Exhibit B(13) above (*requests for relief 5 and 6*).

**DECLARATION OF EXHIBIT C(3): JOB APPLICATIONS SINCE 2022 (159 F.2d 169 (1947))**

The confirmation emails for job applications that were previously filed in Docs. 98 & 121 as well as new ones since January of 2025 are included as Exhibit C(3). Before September of 2024, I applied to two affordable housing planning and development positions in LA County (*Doc. #98 pg. 27-32, 35-36, 39-40*), several homelessness services positions in LA County (*Doc. #98 pg. 37-38, 130-138*), several presidential campaigns (*Doc. #98 pg. 41-60*), several public sector positions in Orange County (*Doc. #98 pg. 69-78, 152-153*), a position in Washoe County, NV (*Doc. #98 pg. 79-80*), several positions in the federal government (*Doc. #98 pg. 81-100*), several positions at the University of California, Irvine (*Doc. #98 pg. 101-107, 139-151, 162*), positions at several advocacy groups (*Doc. #98 pg. 108-120*), positions at several local law firms (*Doc. #98*

*pg. 61-68, 121-129*), and many jobs posted on Indeed.com or elsewhere like at Heavenly Ski Resort (*Doc. #98 pg. 33-34, 154-161, 163-199*).  Since September of 2024, I have applied for positions with Immigration and Customs Enforcement (*Doc. #121 pg. 41*), the US Forest Service (*Doc. #121 pg. 42*), the presidential transition team (*Doc. # 121 pg. 47*), the California Attorney General's office (*Doc. #121 pg. 52-53*), the Nevada Attorney General's Office (*Doc. #121 pg. 59*), several positions at Lake Tahoe Community College (*Doc. #121 pg. 78-81*; *Doc. #130 pg. 30*), several local public sector jobs (*Doc. #121 pg. 82; Doc. #130 pg. 41 & 61-62*), several local law firms (*Doc. #121 pg. 12-13, 16-19, 60-61; Doc. #130 pg. 40, 50, 76*), and many jobs posted on Indeed.com or elsewhere like at Heavenly Ski Resort (*Doc. #121 pg. 10-11. 14-15, 20-40, 43-46, 48-51, 54-58, 62-77, 83-87; Doc. #130 pg. 22-29, 31-39, 42-49, 51-60, 63-76*).  Since I have not been able to obtain a bachelor's degree in criminology after being suspended for three years due to the causes listed above, the **loss of opportunity** that has occurred in my life is severe. Some of the job postings sent me reply emails saying "we have moved forward with someone else" feedback, but most did not.  I persistently sent many repeat applications, and I applied to many jobs on private websites with software that did not send me any confirmation email.  I have applied to more jobs than those that I have compiled below.  Potential employers who have viewed the education status on my resume have, with all substantial certainty, made **judgments or assumptions** based on the false appearance that I have dropped out of college.  The conclusion I am drawing from Exhibit C(3) materials is not that I would have been hired to all of these jobs for certain minus the false appearance of being a college drop-out, if I instead had my bachelor's degree right now.  The **injury** demonstrated by Exhibit C(3) materials is ***irreparable damage*** to my young-adult life academic and free time, during my entire twenties.  The **causes** that Exhibit C(3) demonstrates is that the false appearance as a result of official university actions, or in some cases, the lack of a bachelor's degree I would have already had two years ago as a consequence of up to 50 instances where the University of California boldly broke its own policies and constitutional law have contributed to an (1) ***irreparable injury* over the last two years of my time** due to whether the lack of a bachelor's degree has **completely cut me off** from the career-

type opportunities that I applied to after 2022; and (2) ***irreparable injury*** to my efforts during my young-adult life academic and free time, during my entire twenties.  I cannot get the years lost in my entire twenties back.  The **relief** I am requesting from the court under this line of inquiry is the same as the second and third for Exhibit B(13) above (*requests for relief 5 and 6*).

**DECLARATION OF EXHIBIT C(4): CONTACT WITH LAW FIRMS**

Out of all of the firms I have contacted, only 58 have replied at all.  I have tried using several free lawyer referral services on Google in Alameda County, Orange County, and the State of California.  The expectation to contact an endless number of law firms is not reasonable, especially when the number of educational rights attorneys runs low and when the feedback has become predictable.  I received replies from the following firms on the following dates.   On September 15th of 2023, I received a confirmation email from Audet & Partners (*Doc. #98 pg. 200*).  On September 22nd of 2023, I was turned down by Best Best & Krieger (*Doc. #98 pg. 201-202*).  On September 15th, I was turned down by Bohm Law Group (*Doc. #98 pg. 203-204*).  On September 18th of 2023, I was turned down by Constantine Cannon (*Doc. #98 pg. 205*).  On September 21st of 2023, I was turned down by DeMaria Law Firm (*Doc. #98 pg. 206-207*).  On September 17th, I received a confirmation email from Hahn Legal Group (*Doc. #98 pg. 208*).  From September 14th to September 21st of 2023, I told Jenna Parker from Hathaway & Parker that I do not have $600 per hour of service and can only work from a contingency agreement (*Doc. #98 pg. 209-211*).  On September 15th of 2023, I was turned down by King & Siegal (*Doc. #98 pg. 212-224, 220-222*).  On September 15th of 2023, I was turned down by Broslavsky & Weinman (*Doc. #98 pg. 215-217*).  On September 19th of 2023, I was turned down by Keller & Grover (*Doc. #98 pg. 218-219*).  On September 20th of 2023, I was turned down by Kohn, Kohn & Colapinto (Doc. #98 *pg. 223*).  On September 20th of 2023, I was turned down by McCune Law Firm (*Doc. #98 pg. 224*).  On September 25th of 2023, I was turned down by McNicholas & McNicholas (*Doc. #98 pg. 225*).  On September 18th, I received a confirmation email from Michelle Ball (*Doc. #98 pg. 226-228*).  On September 20th of 2023, I was turned down by North

& Nash (*Doc. #98 pg. 229-232*).  On September 27th of 2023, I received a confirmation email from Vincent W Davis (*Doc. #98 pg. 233-234*).  On September 19th of 2023, I was turned down by Wade Litigation Group (*Doc. #98 pg. 235*).  On September 14th of 2023, I received a confirmation email from Winer, Burritt & Scott (*Doc. #98 pg. 236-237*).  On November 21st of 2024 I received replies from Laub & Laub (*Doc. #121 pg. 89-91*) and Killpatrick and Bullentini (*Doc. #121 pg. 88*).  On November 21st of 2024, I received replies from Burke Williams and Sorensen (*Doc. #121 pg. 92-94*) and Kostnett law firm (*Doc. #121 pg. 95*).  On November 26th of 2024, I received replies from the law office of Michelle Ball (*Doc. #121 pg. 96-97*).  On November 27th of 2024, I received replies from the Leigh law firm (*Doc. #121 pg. 98*) and F3 law firm (*Doc. #121 pg. 99-100*).  On December 3rd of 2024, I received replies from the law office of Stephen Rodriguez (*Doc. #121 pg. 101*), Lazarus Law and Justice Project (*Doc. #121 pg. 102*), Butch Alter (*Doc. #121 pg. 103*), Burris Nisenbaum Curry and Lacy (*Doc. #121 pg. 104*), Kelsuk law office (*Doc. #121 pg. 105*), Cutter law office (*Doc. #121 pg. 106 & 139*), and Grombchevsky law office (*Doc. #121 pg. 107*).  On December 4th of 2024, I received replies from Audet and partners (*Doc. #121 pg. 108*), Badame law office (*Doc.#121 pg. 109*), King and Siegel (*Doc. #121 pg. 110*), Lento law firm (*Doc. #121 pg. 111*), law office of John Burris (*Doc. #121 pg. 112*), KJK Student Defense (*Doc. #121 pg. 113*), Corrigan Welbourne Stokke (*Doc. #121 pg. 114*), Bohm law group (*Doc. #121 pg. 115*), Greene Broillet Wheeler (*Doc. #121 pg. 116*), Helm law office (*Doc. #121 pg. 117*), law office of Michael Fell (*Doc. #121 pg. 118*), the Garza Firm (*Doc. #121 pg. 119*), Eisenberg and Associates (*Doc. #121 pg. 120*), Genie Harrison (*Doc. #121 pg. 121*), Wade Litigation (*Doc. #121 pg. 122*), Evans law firm (*Doc. #121 pg. 123*), Kohn Kohn Colapinto (*Doc. #121 pg. 124*), Winer Burrit Scott (*Doc. #121 pg. 125*), Sanford Kassel Law office (*Doc. #121 pg. 126-127*), Constantine and Canon (*Doc. #121 pg. 128*), Nostrati law office (*Doc. #121 pg. 129*), Lerner and Rowe (*Doc. #121 pg. 130*), and Robins Kaplan (*Doc. #121 pg. 131*).  On December 5th of 2024, I received replies from Potter Handly (*Doc. #121 pg. 132*), Keller Grover (*Doc. #121 pg. 133*), Vanaman German (*Doc. #121 pg. 134*), and Pointer Buelna (*Doc. #121 pg. 135-136*).  On December 9th of 2024, I received replies from Snyder and Shaw

(*Doc. #121 pg. 137*), law office of Natashe Washington (*Doc. #121 pg. 138*), Molly Watson (*Doc. #121 pg. 140*), Anthony Gonsalves (*Doc. #121 pg. 141*), Lozano and Smith (*Doc. #121 pg. 142*).  On December 10th of 2024, I used an online lawyer referral service to contact Terri Anne Smith, Ernest Hastings Tuttle, Ronald Jason Scholar, Grant Randolph Orbach, Paulla Hyatt-McIntyre, Michael Clancey Stewart, Perry Calvin Leonard, Phillip Addison Covert, Susan Ann DeNardo, Diane Marshall-Freeman, Cynthia Mary Smith, Edmund Gee, Paul Jon Hamil, Shelly Lynn Renner, Dorothy Shelton Landsberg, Ali Mansfield, Marie Nakamura, Andrea Maureen Price, Edmundo Rogelio Aguilar, Angelique Martin Huttonhill, Alesa Rose Schaschter, Paul Eric Lacy, Katherine Starn Legrand, Roberta Susan Savage, Thomas Gauthier, John Scott Smith, Donald Omar Thomass III, Jennifer Stewart-Kemp, Anne Maureen Sherlock, Douglas Alan Purdy, Lesley Beth Curtis, Frank Richard Ruderman, Michelle Leigh Cannon, Jeffrey Lee Massey, Jeremy Wayne Simmons, and Thomas Joseph Driscoll Jr (*Doc. #121 pg. 146-151, 154, 156-157*).  On December 11th of 2024, I used an online lawyer referral service to contact Jean Adams, Betzy Brazy, Kristin Springer, Gilbert Castro, Edmund Siebel, Kathleen Loyer, Brent North, Meldie Moore, and Jeffery Gotlieb (*Doc. #121 pg. 146-151, 154, 156-157*).  On December 12th of 2024, I received replies from Bracker and Marcus LLC (*Doc. #121 pg. 143*), Abir Cohen Treyzon Salo, LLP (*Doc. #121 pg. 144*), and MWGJ Law (*Doc. #121 pg. 145*).  On December 16th of 2024, I received replies from Allred Maroko and Goldberg (*Doc. #121 pg. 153*) and the law office of Oscar Gutierrez (*Doc. #121 pg. 154*).

**DECLARATION OF EXHIBIT D(1): PROTECTED TRIAL-PREP MATERIALS (FRCP 26(b)(5))**

On October 13th of 2024 at roughly 5:45PM, I heard a knock on my front door.  I was unable to answer the door, but my neighbor described a familiar young couple at my front door via text message (*Doc. #110 pg. 2-4*).  The event is significant because the male he described matches the description of a named individual in "SLTPD report Exhibit D" supplemental or related to 1710-0332 (*Doc. #110 pg. 5*).  It is even more significant because "Cole Ruccione" has never been to

my house and should not know where it is otherwise, and he was involved in another event in the days beforehand where he saw my car for the first time and I obtained the NV license plate number of the car he was riding in (NV "oatmilk").  This small event is significant to my case because it constitutes the most recent occurrence of a "cryptic event" not yet released from my protected trial-prep materials.  The event is even more significant because I have been documenting unusual events in my hometown squarely related to the "destroying my hometown" protected trial prep materials mentioned in Doc. #98 (*pg. 17-18*).  These events are new information, so I did not have the opportunity to file them in the District Court before.  I am only requesting for this information to simply be acknowledged on the record as it was in Doc. #122.

February 13th, 2025

By: *Bobby Gonzales*
_____
Robert V. Gonzales