1  Robert V. Gonzales
   PO BOX 7804
2  SLT, CA 96158
   Telephone:    530-523-3822
3

```
                                          FILED
                              CLERK, U.S. DISTRICT COURT

                                02/18/2025

                              CENTRAL DISTRICT OF CALIFORNIA
                              BY_____DVE_____DEPUTY
                              DOCUMENT SUBMITTED THROUGH THE
                              ELECTRONIC DOCUMENT SUBMISSION SYSTEM
```

4

5

6

7

8                    **UNITED STATES DISTRICT COURT OF**

9               **CENTRAL CALIFORNIA, SOUTHERN DIVISION**

10

11   ROBERT V. GONZALES,                 **CASE NO.  8:23-cv-01788-JVS(KESx)**

12              Plaintiff,

13        v.                              Timeline for Audio Exhibits

14   THE REGENTS OF THE UNIVERSITY        B(3-6), A(6), A(12), A(9)
     OF CALIFORNIA, Et. Al.
15
                Defendants.
16   Table of Contents

17

18   Summary                                              Pg. 2

19

20
     Exhibits B(3-6) Student Conduct Hearings             Pg. 2-12
21

22
     Exhibit A(6) Whistleblower Conference                Pg. 12-14
23

24
     Exhibit A(12) Threat Assessment Hearing              Pg. 14-20
25

26
     Exhibit A(9) Conferences with Mr. Gherini            Pg. 20-28
27

28

DEFENDANTS' INITIAL DISCLOSURES

**SUMMARY**

I have already appealed my university grievance procedure through the normal process and finished my term of suspension. I am challenging whether the investigation leading up to it and the punishments issued were prompt, fair, and equitable. The purpose of reviewing the Exhibit B(3-6) audio recordings is to demonstrate how Mr. Coronel, distorted several important statements in my suspension hearings in a way that influenced his determinations as well as those of members of the Student Conduct Review Board. Most recognizably in points 7 and 9 below, I caught Mr. Coronel in several lies between his interim suspension report and my initial summary of the audio recording at the time. There are major disconnects on the record that impacted my student conduct case compared to a hypothetical situation where those mismatches were not part of the record. Below are also the timelines for my audio recordings of whistleblower office investigator Kathie Allen, the private contractor hired by the University Dr. Manny Tau, and UC defense lawyer John Gherini. The only way to prove the lies alleged in my court filings is with these audio recordings. When thinking of how I did not always communicate myself well, please consider the magnitude and pressure of the underlying facts instead. **I will file the audio files with the court by mail or in-person by the discovery cut-off date on July 18th of 2025.**

**Exhibits B(3-6) Student Conduct Hearings**
**12/3/2020 11:59**

**1. (2:50-3:13)** Mr. Coronel introduces himself as "the Associate Director of OAISC." I found and still find it unusual and questionable that an office manager was and still is personally managing my case. Wouldn't a student conduct case normally be assigned to a staff investigator? What about my case caused it to be singled out by the Associate Director? What is more interesting is that I have been told several times by other office staff is that he is "not the Associate Director," just an office investigator. I was told this once over the phone on September 5th of this year when I initially contacted the OAISC to start the process of lifting the academic

hold.  I was also told that he isn't the Associate Director at an unknown time between 2020-2021, which led to me ask this year.  I don't think he has been demoted since that time, but it is either that or he was just lying instead.  The first 30 minutes consist of my questions about the process.

**2. (25:16-26:02)** I mention the unusual, cryptic circumstances on campus to Mr. Coronel for the first time, in the format of "privacy and confidentiality issues for the university."  He responded that the OAISC will highlight that issue, and put it aside to come back to it later.  Obviously, they never did.  In normal circumstances, a student conduct officer would take priority over gathering any information that may be legally sensitive for the university.  The OAISC did express as much interest in the weird, unusual circumstances I experienced on campus as I received from Mr. Coronel back then, but I was never asked about the topic again after that.  What about my case made it so that "privacy and confidentiality issues" were repeatedly ignored by other university officials beforehand, and was again not receiving a fair and thorough investigation by the OAISC back then and now?

**3. (29:09-30:59)** We spent minutes ten minutes leading up to this time discussing the "releasing of sensitive information" in a hypothetical situation where there is a credible threat of retaliation for doing so, in length.  The actual retaliation which I was drawing the hypothetical from was at a past job I was referring to, by a coworker, related to pointing him out for bringing hard drugs to the workplace.  The "sensitive information" I did not release at that time was who that coworker was, due to fear of retaliation by a hard drug user who could easily determine when and where he was revealed to the boss.  I did not try to bring a case at that time because I was not ready, but I still have the records.  Mr. Coronel eventually states that he has seen the situation I described before, and he would not determine that withholding information in that case is a form of refusing to comply with the investigation (**at 30:04**).  While my hypothetical question certainly requires far more clarity than others I've asked of Mr. Coronel, the conversation leading up to this time was never about sensitive information released "by the university," but probably instead to it.

- 3 -

Suddenly questioning whether I was talking about the university releasing sensitive information after ten minutes of discussion about that topic tends to follow a pattern commonly seen almost anywhere as attempting to change a topic by focusing on small parts of the idea in question or using slightly different language.  I may have had a clearer conversation if I mentioned "retaliation threat [by a coworker] in that situation."

**4. (33:36-34:47)** My "Primary RLC Coordinator" for Arroyo Vista housing, Janet Cardenas, alleges in the initial report to OAISC that she never saw any of my many emails over two days in Exhibit B(1) University Subexhibit B about the food safety hazard situation in my dorm.  The reason I was given is that she was not on duty during those two days.  However, Mr. Coronel states that my attempts to contact the Arroyo Vista housing staff member "are not pertinent to" the conversation, despite its role leading up to the incident.  I am not sure why else housing staff managers from different communities would "rotate" to oversee housing communities, other than the one they are assigned to, unless they are covering for someone who is off duty.

**5. (34:57-36:00)** Arroyo Vista housing staff appear to have made a separate version of the police report.  I'm not sure if it is a normal university process to write a supplemental report about information forwarded to them by police.  If that is normal procedure, it is certainly unusual and questionable due to its highly exploitable nature as shown by other mismatches between my final suspension letter and the audio recordings.  Interestingly, Mr. Coronel changed his answer from what he told me during this hearing in his final suspension letter when he stated that it was the police report and not a housing report of information provided by police, as shown by the fourth "NEXT" in Exhibit B(1) University Subexhibit E.  Which is it?  I don't think student housing writes separate, supplemental reports, but either they did or he was lying.  Why play telephone, instead of forwarding the PD report or other direct information?  If the unknown housing report statements about being kneed in the face at the end of the fight match those of the university PD, then I stand by the notion that it is an inaccurate, "suspicious" representation of my statements as

- 4 -

can be shown by any bodycam footage.

**6. (36:28-39:47)** At the time, I readily admitted that I did a poor job at defending myself and deescalating the situation, and I stand by that.  I also stated that I "initiated the situation" by getting the attention of the individual with whom I had the fight when I shoved his shoulder, given I was not receiving a reply from housing staff about the food safety hazard situation he was creating, and he was not replying to anything I said for the month leading up to that week.  However, the other individual "escalated" the situation.  Pushing on someone's shoulder to get someone's attention in that unusual situation still does not warrant the kind of escalated response I received, as directly objected to by Mr. Coronel.  At **38:13**, I begin to describe how I stopped being kneed in the face many times over, which is my FOURTH dispute from Exhibit B(1) University Subexhibit E.  In the fight, the other individual did not express an intent or desire to de-escalate until the point when I had stopped him from kneeing me in the face, after the fact.  In the fifth paragraph of the "Summary" in his final suspension letter, Mr. Coronel makes his determination largely based on the other individual's outburst I describe shortly thereafter, which is my FIRST dispute.  In fact, the exact etymology of the other individual's statement that "[he] wouldn't do" anything like that after the fact, but right before calling 911, seems to indicate his thoughts about whether he himself thought of himself as the aggressor, especially given his immediate escalation of the level of force.  I copied Mr. Coronel's statements about what the other individual's late outburst "indicated" about what he "wants" from the final suspension letter and pasted them into B(1E.1).

**7. (40:29-44:18)** I state that the situation basically ended with me punching the other individual in the face no more than five times.  I am not claiming that I did anything good to de-escalate the situation while caught off guard wearing socks on a slippery floor.  I am claiming that the other individual's expression to de-escalate within the timing of events shows that it was a false statement, but Mr. Coronel determined that it was a genuine statement.  I go on differentiate

- 5 -

between forms of "choking" beginning at **41:49**, of which hand maneuver and expression I

described amounts to my attempt to get off the ground.  However, Mr. Coronel directly lied in his

final suspension letter by saying "the choking was equally done," as mentioned in the EIGHTH

dispute from B(1E) and demonstrated at this moment in time.  Mr. Coronel even mentions

"knees" to the face at **43:30** as mentioned in my FIFTH dispute, which I did not know until after

the hearing.  Until the end of this part of the clip, Mr. Coronel says that he would have wrote

down that I somehow kicked the other individual from the ground while being kneed, before

"torquing" his leg in order to escape, which would be impossible.


**8. (46:46-53:10)** I was kneed in the face more than 10 times, but I don't remember it being

mentioned in my final suspension letter even though he repeated it back to me at **48:10**.  At

**47:05**, Mr. Coronel repeated that he wrote the same impossible way for the event to occur after I

just corrected him, in the form of me hypothetically kicking the other individual in the chest from

the ground after having slipped, before getting back up.  He may have been double checking, but

what else would he have written down if I had not slowed down to correct him here.  From **48:52**

to **50:47**, I thoroughly describe the difference between stopping the event of being kneed in the

face and "putting him on the ground" by any other means.  Nevertheless, Mr. Coronel's final

suspension letter expresses partiality towards the other individual by downplaying the way I was

kneed in the face and oversimplifying minute details related to escalation and intent.  The

insistence that I "put him on the ground" without consideration as to how and why I did the act

using those particular words is probably indicative of this same pattern.  Mr. Coronel seemed to

hold my recall of the events to an unreasonable standard of expectation as it relates to the minutia

of individual body movements.  The "legal questions that I don't know" which I have in regards

to this particular incident have to do with the "weight" of "safety" related case information which

I had initially provided to Arroyo Vista housing staff information in in B(1B).


**9. (58:54-1:05:50)** After going through his timeline of the incident one more time, we began to

discuss what led to the fight.  My SECOND and THIRD dispute with the final suspension letter has to do with the misrepresentation of whether I felt there was an urgent threat to my safety B(1B & E.2&3).  "A previously established pattern of behavior" was not a good description of the other individual's decision to ignore me for a month and then start moving my food around in the dorm fridge.  After referencing the emails where I described the food safety issue in B(1B), I was asked whether anything requires the other individual to respond to me in normal circumstances or any circumstance at **1:01:35**.  At **1:03:42**, I am asked about distinguishing a threat of imminent, physical attack from a question of safety related to the unknown condition of my food.  I do not know what else may have happened to my food when it was being moved around, and that unknown condition of my food would have the same effect whether I am ingesting it at the time or a later time like Mr. Coronel asked about.  Mr. Coronel follows at that time by posing a hypothetical where someone was instead tampering with my food while in front of me.  In a less educated environment, the hypothetical Mr. Coronel posed may be more likely, but an educated person at a university who desired to tamper with food would most likely not do it in front of their intended victim.  In Mr. Coronel's determination, only food-tampering done in front of the victim would qualify as a food safety hazard.  My "supposal statement" referred to in B(1E) is when I "suppose" after **1:04:00** that tampering with my food behind my back or not is not an imminent threat in the same way that being violently attacked is.  "All my references back to circumstances" was not a good description of Arroyo Vista housing staff's role in not answering my emails and leaving me to my own devices to handle the food safety hazard (B(1B)).  The purpose of this fact is to demonstrate that Mr. Coronel misrepresented my statements about whether I felt there was an urgent concern for my safety while ingesting my own food.  However, given my emails with Mrs. Cardenas which were sent for two days before the fight occurred, Arroyo Vista's role in contributing to my response to the unresolved food safety hazard was negligence in their role to take administrative responsibility over the matter.

**10. (1:06:35-1:32:25)** After going over another set of allegations from two separate interim

suspension letters which I had refuted in emails after asking more questions later, I briefly made

emphasis out of the most serious one at **1:10:07** by emphasizing that the definition must be

closely paid attention to.  I was originally accused of violating a terrorism policy (UC PACAOS

102.24), which I disputed in my emails based on the term meaning violence based on political

motivation.  Another example of an accusation I had refuted, related to "flags" and "private

decorations in dorms," was not taken kindly by a different "Resident Advisor" housing staff

member when I told him to go look at other dorms like I had, leading up to the week when the

other housing staff member began to ignore me.  I thought my Resident Advisor might steal my

flags, so I kept photos of other private decorations around Arroyo Vista.  In my OAISC SCRB

appeal letter (Exhibit A(3)), the review board for my case accepted most of my descriptions on

these separate matters and agreed to overturn many of the accusations from the three interim

suspension letters.  However, my response to the evidence does not warrant the terms of a

permanent disciplinary probation, given that I have been falsely accused of terrorism, for one.

**11. (1:44:24-1:58:49)** I was told I would be given an exception from the interim suspension

requirement to leave my dorm immediately for one weekend, but then I was coincidentally

identified as someone who came in contact with a person who tested positive for COVID-19 on

the day after this hearing.  I kept a separate audio recording of the quarantine process call as well

as several emails with campus social workers and the Dean of Student Services.  This enabled me

to go to quarantine housing, after staying in my car on that Monday night before I saw the

messages related to quarantine.  I was under the understanding that the mandatory quarantine

period was two weeks.  However, I was "cleared" after one week instead, and I was still not

allowed to gather my property from my room after my week in quarantine housing was up, until

December 19th, 2020.  I was expected to pay accommodations expenses for an period of time

unknown to me at that time, or drive between NorCal and SoCal while waiting to collect my

property.  Instead, I stayed in my quarantine unit until I was told to leave, went back to my dorm

until I was told to leave, stayed another night in my car, and then learned that my Parents have a

friend in San Diego.  In my timeline of unusual incidents on campus probably related to

confidentiality issues, I *also* documented the apparent slow-walking of the removal of the other

individual from the dorm.  He came back into the dorm over several days to periodically remove

some of his kitchenware at a time to somewhere else, sometimes alone and other times while

escorted by campus PD.  After the fight, I was asked by the campus PD officers if I request to

have him removed from the dorm, by their "power" and not the university's according to Mr.

Coronel and housing staff shortly after **1:56:50**.  This exact question about confidentiality issues

is supported by the fact that the other individual, Kidra Setayashi, did not attend the appeal

hearing which I recorded almost one year later, because he had already graduated according to the

Student Conduct Review Board, possibly while staying in a dorm for the rest of the year after all.

Nearer to the end, Mr. Coronel considered giving me the weekend to find a place to stay other

than student housing, but he later sent me emails the next day which directed me to leave after I

made contact with a campus social worker.


**12/16/2020 15:06 & 15:23**


**1. (13:11-18:05)** The first **6:30** are spent reviewing the procedure.  The other three recordings do

not contain a significant percentage of my disputes, but they may be useful to provide additional

context.  Once again, I did not dispute the allegations of events, I challenged their premises.  At

the start of the clip, I explained that I did not have enough time to look through the housing

resources I was given when I was asked about why I did not find another place to stay within 24

hours.  It is worth mentioning that the week of Friday December 11th, 2020 was during finals

week, adding that much more struggle.  The interim suspension letter provided language for an

exception "to be on campus in order to attend classes," which I was doing remotely like everyone

else at the time.  In order not to attend my finals in disorder from a public parking lot, I tried to

rely on this language from the interim suspension letter as a means to stay in the dorms and attend

classes in an orderly fashion.  After the first 24 hours, I did not search for other housing because I

thought I would do my best to utilize the exception in order to stay in quarantine housing and then my dorm for the internet and to have orderly finals.  Before any of this starting at **4:30**, I refer to a hypothetical situation where I could not find public internet or reach Mr. Coronel before the hearing.  I highlight this statement partly because I refer to it as a "privacy and confidentiality issue," given other unusual events I had been subjected to on campus leading up to that point.

**2. (23:55-29:05)** At **26:10**, I list the four reasons why I did not look through the housing resources provided to me enough to make any contacts, which resources included options like AirBnB.  I mentioned "finals" at **27:25**.  At **28:35**, Mr. Coronel expresses the urgency of acting swiftly if there is "a danger posed to the community" when talking about how action was taken against me during finals, but he did not seem to take this principle into consideration when it came to the removal of the PD-determined aggressor from the dorm I was in at the end of the December 3rd hearing.  I would highlight the parts at **4:30** again here, with the addition of being in a position to take my finals with full mental capacity.  If I was "cleared" to leave in the middle of finals, before the two-week quarantine was over, was I really under quarantine?  Or was I graciously "given permission to stay" there for the first week, but then harshly thrown out at the worst time possibl with foresight that it was finals week given everything else?  Similarly to the other individual, I could have been removed from housing in a gradual process, like after the quarter ended.

**3. (33:47-34:29)** I mention that I have been keeping an audio recording of Mr. Coronel, to which he demanded I stop recording the official university proceeding.  He also denied me the right to "record any meeting I ever have with him," which would give him even more leisure to produce mismatches between what someone talking to him says and how he quotes them in his job.  What is the American justice system without the right to document authentic records?  I would also add that my car was making wheel bearing noises at that time, which I learned during 2021 is not extremely urgent and dangerous unless it is getting louder.

1

2

**4. (00:01-8:30)** The audio when I resume recording is rough.  As the week of Wednesday

3

December 16th, 2020 moved forward and I was told to leave my dorm again, I eventually looked

4

at accommodations options I was provided and elsewhere on the internet.  Mr. Coronel said

5

something about my description of the "circumstances" I described, starting at **23:55** above,

6

which caused me to resume recording.  He even accused me of "not being communicative" with

7

campus social workers (**3:30**) when I was the one who was not receiving a reply (**3:22**) "maybe"

8

within the last day or so at the time.  "Directed not to take my finals" was not a good description

9

of Mr. Coronel's prioritization of the suspension timeline, abuse of quarantine procedure, and

10

double-standard with the other individual in the dorms over the timeline for my finals, or the

11

option to just finish the quarter first (**4:19**).  We did not end up "digging into a burden of proof"

12

for my poor choice or words, nor my "options" for accommodations.  I ask to dig into these

13

questions at **7:09** and then again at **7:56**.  Mr. Coronel simply repeated that it was my choice not

14

to spend money that I did not have on hotels for an unknown period of time at that time.  In the

15

most oversimplified sense, the "choice" was mine, but what choice is a penny over a hundred

16

dollar bill?  I attended the second Zoom hearing from my car in the Starbucks parking lot across

17

from the northeast side of campus, where I had access to wi-fi.

18

19

**1/5/2021 14:20**

20

21

**1. (00:01-12:13)** I had a third hearing about a martial arts sword I brought to campus.  I was not

22

aware that the campus could provide an exception process for weapons, I had originally thought I

23

would bring it and make my case like I did if it ever became a problem.  Despite the serious

24

disconnects in the record, Mr. Coronel accepted that I refute the allegation as a safety concern for

25

the campus, under another policy which is commonly compounded by "zero-tolerance"

26

requirements as with the fight.  I apologized for my poor, reactive choice of words, but I even

27

offer the university an 'increasingly in-demand' service, among other prospective assets (**4:03**).

28

Apparently, interestingly, this third hearing for the weapons policy was held after I submitted an appeal of the final suspension letter, which I did not remember until after reviewing the audio for the first time in 2023/2024 (**11:36**).

**Exhibit A(6) Whistleblower Conference**
**11/17/2023 14:03**

**1. (00:00-7:43)** I begin the whistleblower conference by stating that I want to overlook the incidents with the student conduct office in 2023 in order to focus on the list of matters related to the "spy novel I lived through in 2020" (**00:00-7:43**).  I also remark on the absurdity of the first whistleblower report where it is stated that I alleged no policy violations (**at 1:40**) (*Doc. #128 pg. 63*).  The list of matters included (1) a "break-in" issue which campus law enforcement ignored at the time (**2:01-3:07**), (2) abuse of the "quarantine procedure" through the student conduct office that resulted in "entrapment" as it related to student housing and my duress at the time (**3:10-3:59**), (3) "negligence" by Janet Cardenas on the duty of care related to safety in the dorms in University of California Guidelines on Harassment and Discrimination G(4)(a) before the student conduct issue (**4:03-4:34**), (4) the prejudicial conclusion to direct me to a "mental health counselor" instead of to the whistleblower office to investigate the matters in 2020 (**5:25-6:36**), and (5) "student confidentiality issues" related to the "pattern"-like prejudicial conclusion that seemed to follow me from my community college (**6:37-7:43**).  In my case filings, I listed a series of relevant student confidentiality policies (*Doc. #34 pg. 8-14; Doc. #126 pg. 22-23*).  I did not mention the picture of my former Norcal warehouse boss on the university law school's career office webpage at this time, nor did I include it in my whistleblower complaints, because I wanted to see how the whistleblower office would handle smaller matters before releasing the more sensitive materials.  I also mistakenly mentioned the break-in issue in the context of the decision to assign me to a mental health counselor, when Mrs. Cardenas' decision actually stemmed from the picture of my former boss on university webpages (**at 5:05**) (*Doc. #129 pg. 202-209, 235-*

*236*).  During the conference, Mrs. Allen refuted area of concern 1 as a police issue despite the
campus PD's ignorance to it at the time, and she refuted area of concern 2 as a student conduct
issue.  However, in both of the whistleblower reports, all of my inquiries were wrongly grouped
as either police or student conduct issues (*Doc. #128 pg. 63-64*).  Areas of concern 3-5 occurred
before there was a student conduct issue (*Doc. #129 pg. 193-201*).

**2. (8:36-21:48)** Mrs. Allen asked if I would like to know more about how the whistleblower
office would handle the first issue, but in my state at the time of sifting through the documents for
the first time since creating them, I replied by describing part of the likely cause of how the
picture of my former Norcal, Marine Corps warehouse boss found its way onto university
webpages (**8:36-9:45**).  Then, I described the elements of how Mrs. Cardenas prejudicial
conclusion followed the pattern of issues I would have at my community college (**9:49-10:38**).
Next, Mrs. Allen was more interested in asking me about the Office of Information Technology
"university software" issue in 2023 instead of my complaint documents about the issues in 2020
before there were any student conduct issues, which happened to relate to student conduct issues
(**11:16-12:08**).  Then, Mrs. Allen projected on my inquiry as if I was asking the whistleblower to
"investigate LTCC" and not the pattern-like student confidentiality issues which occurred at the
UCI campus (**12:10-14:46**).  I mention that LTCC's harassment by breach of policy on student
confidentiality may be "harassment" with a "homicidal" intent, given that I have expressed
suicidal ideations to the staff involved at LTCC (**16:00-17:05**).  Mrs. Allen asks if there is
anything else for the whistleblower office to consider, to which I replied with the first two sources
of corroboration for the break-in issue: the Arroyo Vista maintenance log and the complex's lead
meaintenance employee named "John" (**17:45-19:47**).  Next, I mentioned the third source of
corroboration for the break-in issue: the "GroupMe" posts for my dorm by the undergrad
president of the UCI Resident Housing Association (**19:50-21:48**).

**3. (21:54-32:55)** Next, I describe the circumstances of the quarantine issue through the student

- 13 -

conduct office that resulted in "entrapment" as it related to student housing and my duress at the time (**21:54-24:06**). Basically, I was contact-traced a week after coming in contact with a campus law enforcement officer who had the virus according to the contact-tracing audio recording I kept at the time, but that was not the issue. The issue was that the student conduct office stepped into the matter and removed me from quarantine housing after one week, while the quarantine period established at the time by the CDC was two weeks. These events placed me in a state of duress described in my Exhibit B(9) declaration (*Doc. #125 pg. 31-32*). Next, I describe the circumstances of the food safety issue that led to my suspension (**24:34-26:48**). Basically, Mrs. Cardenas ignored my inquiry, so I tested whether she would take another dormmate's inquiry seriously if I did the same thing that was happening to me a few days later, and coincidentally, the housing employee assigned to confront me tried his best to avoid the topic directly, which is indicative of collaboration by university staff of a willful, knowing double-standard related to the duty of care related to safety in dorm housing (*Doc. #125 pg. 34-36*). Then, I describe the conflict of interest set forth by university policy which requires the student conduct office to investigate its own wrongdoings (**28:18-29:10**) (*Doc. #125 pg. 16-17*). Whistleblower Policy Section IV(G)(7) prohibits conflicts of interests in whistleblower investigations, such as requiring the student conduct office to investigate its own wrongdoings. Requiring the problem office to investigate itself for its own hostility to me and my inquiries is especially defective, absurd, and opposed to university policy. The meeting concluded with Mrs. Allen expressing an inaccurate bias when I tried to demonstrate a central issue with law schools (**at 30:36**).

**Exhibit A(12) Threat Assessment Hearing**
**10/10/2023 10:11**

**1. (00:01-9:10)** The first ten minutes of the threat assessment were spent by Dr. Tau and I circling around each other's questions. Dr. Tau asked me for my social security number for identification, to which I requested to select an alternative form of identification. Instead of addressing my

questions about possible alternative identifying information, Dr. Tau spent the first 3-5 minutes evading a question reasonable for protecting my personal information of whether he could use an alternative form of identification. Meanwhile, I did not give him my social security number for the first 3-5 minutes in an attempt to ask him to select another option. At one point, I asked Dr. Tau specifically if there is "other information he could use" instead, and he answered "yes" from between "about 128 pages of documents" from the university where he could have possibly accessed an alternative form of identification for a hypothetical background check other than my social security number (**3:06-3:41**). My question was whether he could use identifying information other than my social security number, and he providing several evasive answers instead of addressing the question directly, while in my case I was simply hoping to provide any information other than my social security number (**3:06-4:59**). Immediately thereafter, I asked whether my threat assessment was focused on specific "policies," presumably those of the university given that the threat assessment is governed by university policies. Instead of addressing my question directly, Dr. Tau projected several apparent elements of clarity onto my question by asking whether I was asking about university "documents" and not university policies, and whether the policies I was asking about were those of "the university." This continued for several minutes (**5:36-9:10**). The purpose of my question was to determine whether any of the policies I was falsely accused of by the university and therefore had overturned, such as "terrorism" in the place of "physical abuse," were once again wrongly being questioned (**8:20-9:05**). After the large, overwhelming pattern of bold policy errors made by the university, I suspected that I needed to clarify whether the university was reviewing incorrect policies. Dr. Tau's alleged questions for clarity evidently did not seek any clarity, and they repeatedly projected to peripheral elements related to each question that were not even being asked about such as "documents" or an unrelated entity's policies. My intent of highlighting the first ten minutes of the threat assessment is to prove that whatever Dr. Tau's intent was in giving several nonanswers to my questions, it was not to seek clarity, and this evidence goes towards proving whether Dr. Tau can speak about the contents of the threat assessment or even just answer

questions credibly.  I, however, am not a professional, and I almost always answer the questions, unless the intent of a question itself should be questioned.

**2.** (**18:24-19:50**) Dr. Tau asked me whether I have ever been arrested, convicted of a crime, or accused of domestic assault which is a perfectly normal part of this process.  However, I have not been, and the incident at the university is an isolated one in my life since I was the one who was assaulted.  Therefore, I felt the need to point this out, as well as the fact that the university's lawsuit record is not clean compared to my legal records in life.  The University of California, Irvine has been sued in the past for extremely bold illegal activity which is being asserted in this case as "unquestionable" (*Doc. #57 pg. 3*).  Some of these lawsuits include retaliation against a professor for pursuing previous litigation, as well as a settlement with the City of Irvine for ignoring development and planning codes for recent building projects.  After I answered the questions Dr. Tau asked and made my statements about the university's legal record compared to mine, Dr. Tau expressed a minor form of microaggression by repeating the questions as if he had not heard them the first time or as if he may project that he did not believe my answers. Whatever Dr. Tau's intent was in repeating the question, I would be really interested to find out, because I am raising it in this timeline for its underlying perspective of "unquestionable," micro-aggresive double standards of law.

**3.** (**19:55-21:45**) I first admonished Dr. Tau not to "do the same thing as Mr. Coronel" by "misrepresenting my statements here" for the first time.  At this time, I did not inform him that he is being recorded so I can prove if he does do the same thing as Mr. Coronel, since I would have no other way of doing so if he did.  I did always appreciate when Dr. Tau actually did, finally "focus on my questions."

**4.** (**21:47-23:00**) Dr. Tau asked me to characterize myself with short answers, which is a normal part of the threat assessment process.  However, his responses to my first characterization of

myself as "questioning authority" goes towards proving his credibility when making official requests and demands.  In my life, I document people who oppose me out of no purpose and intent whatsoever other than bias, if I can prove it.  Dr. Tau evidently could not recognize that "questions authority" is a perfectly coherent, rational answer to his question about characterizing myself, and he seemed to have to attempt to try to cause me to change my answer for no apparent reason other than he didn't like it.  Dr. Tau blindly opposed me with bias so deeply that he actually demanded that an issue with my answer was that it was not "a three-word answer" (**22:24-22:26**).  I am not familiar with any requirement for a self-characterization in a threat assessment to be a "three-word answer," and to attempt to demand such an unusual requirement of me at that time can only lead a reasonably informed person to suspect that his opposition to my answer was primarily driven by an unusual bias to oppose me to maintain a position of authority and false correctness.  I am not sure of the nature of the position of correctness and would be interested to inquire more into the intent, but I am fundamentally sure of the unawareness that must have driven this unusual behavior.  This is a common phenomenon I have experienced throughout "my life, mostly in official settings where the person in a higher position of authority has a simple "cognitive dissonance" need to maintain their position of authority and sense of correctness.  This is something we have all experienced.  For the next 20 minutes of short-answer questions after this, Dr. Tau jumped at every opportunity to limit the scope of my answers every time they slightly deviated from his apparent liking of short answers, in ways that felt unusually controlling to me as the subject.

**5.** (**33:09-35:40**) Dr. Tau asked me two separate questions: whether I have had any "extreme depressive or suicidal thoughts."  My answer was and is yes due to the uncertainty of how my last 11 years of life's efforts have been spent and where my future is heading as a result of university negligence, irreparable injuries, etc.  I admonished the District Court of this fact somewhere early on in my pleadings (*Docs. 1-21*).  Nevertheless, Dr. Tau, a clinical psychologist, ignored this high-standing factor in the total equation, prevented me from moving forward with the hearing by

- 17 -

preventing me from proving any legal issues if necessary, and then compounded the offense by collaborating with the student conduct office and legal team to attempt to intimidate and coerce me not to prepare to prove any legal issues if necessary as a condition to resume the threat assessment (*see Ex. A(9-12)* Doc. #125 pg. 21-25).

6. (**36:20-38:45**) At **36:20-36:50**, I am asked if I have spent several sleepless days which I did not at that time, but at the time of organizing this timeline, I spent nearly the last three weeks in a state of extreme sleeplessness during October-November 2024.  At **37:15-37:45**, I am asked if I have any obsessive thoughts which I did at that time, but at the time of organizing this timeline I spent the same period of time as the sleeplessness obsessing over the elements of indicating to my psychology homework on the record, and community member's apparent, cryptic knowledge of "the government case ruining Tahoe" described back to me by random people on the streets in my hometown!  At **38:15-38:45**, I am asked if I am having any paranoid delusions or hallucinations which I did not at that time, but at the time of organizing this timelineI am basically losing my mind over the elements of "the government case ruining Tahoe" being described back to me by random people.

7. (**53:30-58:28**) Upon the end of segment 1 of the threat assessment, and the beginning of the "contextual phase," my threat assessment rather swiftly came to an end evidently because Dr. Tau did not personally like the way I answered the first contextual question.  I was asked a "teaser question" about causing harm to others, and the response I gave was one that was uninformed about the concept of teaser questions.  Ultimately, I stated that as a student of criminology who has a form of intermediate experience interrogating people myself for my own purposes, I basically thought his question was funny to me because I wouldn't think it would draw out useful information for the intended purposes as a student.  Dr. Tau corrected me, however, instead of correcting the content of the idea presented by an uninformed student, he was evidently more focused on the symbolic nature of my statement that I, a student, was attempting to correct him a

professional doing his job. The "combativeness" in his own tone caused me to become concerned over whether his documentation of my answer would be "oversimplified" (**56:00-57:00**). My intent was not to purport a peripheral symbol of "being more right" than Dr. Tau, it was to purport the central content of the idea that I would not have asked the question the way he did if it were up to me, although I be a student and I am very aware of that. Dr. Tau was more interested in the peripheral symbolism of a challenge to his intelligence by a party who any reasonable person would not even worry about any such interpreted challenge, so he quickly moved forward with a second question, asking whether I wanted to "end the threat assessment" necessary to move forward with the processes and possibly the rest of my life I had spent the previous 11 years working towards (**57:17-57:52**). No reasonable person would presume that I want to cut off my own future over a falsely interpreted mental challenge with no equivalency of foundations in fact whatsoever, but instead, Dr. Tau was more interested in the absurd, and attempted to project back at me that I am choosing to cut off my future for making a statement he didn't like. More importantly, he moved forward with his decision with the "suicidal ideations" factor looming in the background, as a clinical psychologist. Projecting to whether I want to cut off my last 11 years of life's efforts and potentially my entire future over a falsely interpreted, extremely weak mental challenge corroborates the pattern of "a control freak" demonstrated in point 4 above, but to such an extreme degree with crippling results one or more years later as demonstrated in point 6 above. Dr. Tau's projections to attempt to destroy my life's efforts and potential future over something to the effect of 'putting my periods in my sentences on backwards' corroborate the patterns of discrimination and possible retaliation or political bias which I have proven throughout my case. Dr. Tau's "jump" to assume I want to end the hearing and cut off 11 years of effort in my life over someone who "questions authority" and their "combativeness," and to impose such a severe consequence upon someone who fundamentally questions authority over any notion of combativeness if their questions of that authority have a foundation in reasonableness, corroborates the pattern of "a control freak" demonstrated in point 4 above (**57:53-58:28**).

1

2

3      **8.** (**58:33-1:09:39**) For ten more minutes, the conversation went in a circle where I was asked if I

4      want to end the hearing and I kept answering that I never stated or indicated any such idea.

5      Declaring that the asking of questions is combative and that I cannot ask questions 'or else' is

6      projection at best.  Asking questions is not adversarial or combative, and raising a voice over a

7      false accusation is normal.  Inducing a combative tone in someone as demonstrated in point 7

8      above by changing the topic of discussion among other means is also a form of projection.  To

9      demand that anything on the record from the beginning cannot be reviewed until the end instead

10     of off of a fresh memory shortly after a moment in question, and can only be reviewed at the end

11     'or else' such a question is adversarial, is a form of projection, and it is not good record-keeping.

12     It was only Dr. Tau who "wanted to end the hearing," by using sideways means to do so.  For a

13     clinical psychologist to impose such a consequence over a question of authority given that it was

14     my first description of myself as "a questioner of authority" which he was informed of severely

15     lacks correlation between "combativeness," "correcting the combativeness proportionally," and

16     much more.  Dr. Tau was also more interested in trying to change the topic about whether the

17     event was a "hearing or interview" than discussing the substance at hand (**1:03:55-1:05:36**).

18     Then, I reveal to Dr. Tau that I had kept an audio recording of the hearing, to which he responded

19     by saying doing so is "illegal" under CPC 632 (**1:06:40-1:08:19**).  To condition a future hearing

20     by collaborating to prevent me from proving any of the above facts in a resumed hearing because

21     I have no other way of doing so, (s*ee Ex. A(9-12 Doc. #125 pg. 21-25),* is a form of obstruction at

22     best.  Dr. Tau did not give me permission to prove if he is engaging in any legal wrongdoing

23     during the interview hearing, the one which I was not allowed to ask a final question in originally.

24     **Exhibit A(9) Conferences with Mr. Gherini**

25     **12/15/2023 12:52**

26

27     **1. (00:00-2:45)** Mr. Gherini starts off by stating that he does not "have authority" to accept

28

service on behalf of university employees, despite acknowledging that my service to the Regents of the University of California Office of the General Counsel is service to those employees "within the course and scope of their employment with the university" (**00:45-1:00**)  My service was not addressed to Mr. Gherini, but instead to the Regents in compliance with their guideline for service of process published on their website (*Doc. #20*).  The Regents' legal team has set up one procedure for service of process and then seems to try to assert a "different," unknown procedure which leaves the door open for them to choose to either create a false appearance of accommodating persons who serve process in compliance with their procedure.  It would be hard for any person who is serving documents on the university to know what the alternative procedure under which Mr. Gherini "has authority" if the Regents' intentionally publish a different procedure on their website.  After discussing the service of process, Mr. Gherini shows that his initial "understanding "of my claims only extended as far as my threat assessment hearing with Dr. Tau (**2:00-2:45**).

**2. (3:00-11:30**) Mr. Gherini acknowledged that he "tried to read through some of the material I filed" with the court, which includes many more lines of inquiry other than my suspension and threat assessment hearing (**at 3:32**).  Mr. Gherini then asks me what I "want to achieve through the lawsuit," to which I answered with the list of remedies filed in my CV-66 form (**at 4:05**) (*Doc. #125 pg. 8*).  Despite stating that the issue related to request for relief 1 with my online university software account was removed from my case in Doc. #16, Mr. Gherini asked for clarity on the matter (**4:24-4:44**).  As an independently criminology student who has become intermediately experienced in forms of interrogation in the course of proving lies in my own life, I have found that such moot questions for clarity are often attempts to change the topic of discussion or distract from it.  While continuing to discuss my 5 requests for relief, I list expedited resolution for my "academic hold" (request for relief 2), restoration of my "handshake account" university job application software (request for relief 3), inquiry by the university into "affordable housing issue" (request for relief 4), and inquiry by the university into "50 unusual

coincidences on campus" (request for relief 5) (**5:00-8:50**).  Requests 4 and 5 were left undetailed at the time of this conference because I had not yet submitted any disclosures on those matters. When discussing request for relief 4, I mentioned [my two job applications with Orange County] for developing and managing an affordable housing project (**9:00-9:50**) (*Doc. #98 pgs. 27-32*). As the conversation continues, I allege that I have compiled evidence that the long-delayed plans to redevelop the "Las Lomas" apartment complex on campus conflict with affordable housing laws (**10:00-11:30**).  I only made a claim related to my initial request for relief 4 because, while I was removed from campus housing in a state of duress, the apartment complex caught my attention while I stayed in the parking lot there for a few nights in my car.  I have since removed the claims related to affordable housing from my case.  Mr. Gherini also did not ask for much clarity on the topics of my academic hold or the 50 unusual incidents on campus.

**3.** (**12:19-22:20**) I repeated that my case as filed at the time of this conference only covered disclosures related to requests for relief 1-3 (**12:30-13:23**).  Mr. Gherini follows by asking if I desire to return as a student at the university, to which I reply "absolutely" and clarify on my own more on the academic hold issue which is at cause (**13:35-14:24**).  My clarification involves a comparison to US CONST Amd. IV.  The academic hold involves a term of "permanent disciplinary probation," against UC PACAOS 105.03 (*Doc. #126 pg. 22*).  My comparison illustrates how a permanent disciplinary probation against university policy is much like an unlimited search warrant to search someone's person, property, effects, and papers at any time for any reason (**14:25-16:10**).  The academic hold with a permanent term of disciplinary probation not only violates university policy, it also constitutes an irreparable injury because I can only qualify for the financial aid which I spent my entire young-adult life working towards if "I am in good standing with the university" (*Doc. #128 pg. 31-33; Doc. #130 pg. 18-21*).  I follow by mentioning how the Regents' centralized liability to "chase after" a "mess" of lawsuits at individual universities leaves no incentive for those universities to follow their own policies or other law (**17:22-19:13**).  Mr. Gherini then asks if I would resume the threat assessment hearing,

to which I answered that I have "previously expressed" that interest and "I think the university has lost its authority" to conduct that process [by making a condition of the hearing to prevent me from gathering evidence against procedural due process under US PACAOS 103.10 (*Doc. #125 pg. 21-25*)] (**19:14-20:04**).  Mr. Gherini then asks if I will amend my complaint any more, to which I answered that "I will file more documents" not knowing that doing so will constitute an amended complaint (**20:33-22:20**).


**4. (22:23-33:28)** Mr. Gherini asks why I filed in federal court as opposed to State court, to which I answered that the audio recordings which constitute "authentic evidence" under "due process" are a major object to my standing in federal court under *Steffel v. Thompson, 415 U.S. 452 (1974)* (**22:23-23:44**) *(Doc. #56)*.  However, I did inaccurately state that public officials acting in the course of their duty are considered as "private persons" under CPC 632 (**at 22:40**).  Mr. Gherini asks about how to "move forward" and offers to help me "navigate the process" of my academic hold and threat assessment hearing within his discretion, (**23:50-24:35**).  I respond to his question and offer by saying "not even close" in the sense that the university has a serious burden to meet first, and I go on to discuss that the university has to take a possible "murder" issue related to request for relief 5 seriously in the whistleblower process for the next three minutes.  However, the university did not take the "unknown retaliation issues" seriously, and I have repeatedly discussed with Mr. Coronel via email that I wanted to resume my threat assessment hearing without a condition that violates the university's policy on procedural due process (*Doc. #128 pg. 12-13, 15-16*).  Mr. Gherini did not ask for any more clarification on the severity of the unknown retaliation issues, and instead began discussing the federal process for stipulating the service of process in Doc. #39 (**26:35-27:17**).  I go on to ask Mr. Gherini if he would be interested in scheduling discovery [conferences] in order to disclose matters relevant to request for relief 5 (**27:18-31:20**).  Mr. Gherini then projects that I would not like to resume my threat assessment hearing under any circumstances (*Doc. #81 pg. 2*), regardless of the condition against university policy that I raised with him via email and in court documents (*Doc. #125 pg. 21-25*).  I

responded by indicating that I would resume the threat assessment hearing if the condition for me to cancel my litigation "as an exchange" to move forward with the process was removed, and I would have also remembered to ask to remove the condition which violates university policy on procedural due process if the video did not cut out at that time (**31:50-33:28**).

**12/22/2023 14:18**

**1. (1:57-3:09)** We start off this second conference with Mr. Gherini asking what my claims to federal jurisdiction rest on, which I previously disclosed to him in point 4 above during the first conference (**2:06-3:09**).  However, I did not mention the *Steffel* precedent by name, and I also confused the duties of public officials with the rights of private individuals under CPC 632 again. In the *Steffel* precedent, the Supreme Court ruled that the threat of State prosecution without any pending litigation is the duty of federal courts to take up, unlike in the case where there is pending State litigation (*415 U.S. 452 at 462*).  The *Steffel* precedent constitutes an exception to the normal requirements to exhaust judicial remedies.

**2. (3:22-14:46)** Mr. Gherini asks for clarification on the relevance of due process, to which I replied that the right was violated when Dr. Tau denied my liberty to record the threat assessment hearing as a condition of rescheduling and resuming the process, and when Mr. Coronel issued my punishments as a result of me recording the student conduct hearings in part (**3:22-5:49**). Then Mr. Gherini raised an issue about US CONST Amd. XI precluding the university from federal liability (**5:50-6:33**).  However, Amd. XI only precludes suits brought by citizens of another State or of a foreign nation, whereas I have resided in CA for my entire life (*Doc. #126 pg. 12-13*).  Mr. Gherini then agrees to accept the service of documents by email (**7:50-8:34**) as he also did via email (*Doc. #128 pg. 68*).  Then, I mention that I filed a document with the court mentioning two "nonsensitive" disclosures which I requested for Mr. Gherini to retrieve as well as "phase two" disclosures which I did not reveal at the time (**9:12-11:30**) (*Doc. #37*).  I also

requested to hold a set of conferences to clarify the pleadings which Mr. Gherini has had such a hard time understanding (**at 10:20**).  We conclude the conference after Mr. Gherini asks me to send him the new filings (*Doc. #128 pg. 69-70*) (**12:34-14:46**)

**1/8/2023 10:37**

**1. (00:00-5:50)** Mr. Gherini acknowledged the requirement for the parties to meet and confer to clarify the pleadings (**00:20-00:30**) and agreed that we will need to "schedule a larger window of time" if the pleadings are still unclear (**1:00-1:15**).  However, January 8th of 2024 was the final conference Mr. Gherini was willing to hold.  Mr. Gherini never accepted my many requests to further "sort out" the pleadings (**at 1:28**).  Mr. Gherini nevertheless repeatedly asserted his own lack of "understanding" of the "information" contained in the pleadings as a defense in the case, against FRCP 8(b)(2), 8(b)(5), and 11(b)(4) despite the opportunity to have held several more conferences to clarify the pleadings (*Doc. #128 pg. 78*).  His deniability to assert his own lack of understanding of case information as a defense, given the many opportunities we had to hold more conferences to sort out the pleadings, is unplausible, and it is not a fair defense.  Mr. Gherini then asks whether there are still lines of inquiry which I did not file at that time, to which I answered that I had filed many of them and provided notice for what I still had not filed (**1:44-3:55**) (*Docs. 40-42 & 50-53*).  Mr. Gherini's question serves as evidence that he may not even be reading case documents very thoroughly if at all as shown throughout case documents, similarly to asking about the object of my claim to federal jurisdiction in the previous conference (*Docs. 65, 68, 70, 77, 79, 83, 87, 90, 96, 117, 122*).  While we are discussing Mr. Gherini's "generic statement" defense and motions that I have zero federal claims and zero evidence in Doc. #57 before they were filed, he asks me to repeat each line of inquiry much like in point 2 above during the first conference (**3:56-5:50**).

**2. (5:51-12:27)** I go on to further illustrate how little into my claims Mr. Gherini has even read

into despite his asserted defense that I have "zero evidence."   My illustration mentions how Janet

Cardenas wrongly perceived me as a protected class to make an "unofficial medical diagnosis" in

order to ignore my attempts to launch a whistleblower investigation in 2020, eventually breach

the "Guidelines on Discrimination and Harassment G(4)(a)" duty of care in university dorm

housing, and lead to the irreparable injury to my financial aid qualifications in the form of a

permanent term of disciplinary probation against UC PACAOS 105.03 (**5:51-7:24**) (*Doc. #128

pg. 28*).  I did not explain the elements of the issue at first only to illustrate that Mr. Gherini is

asserting an unfair defense without even having read into the claims enough to make the defense

credibly.  I go on for the next 4 minutes describing those elements of how Mrs. Cardenas made a

prejudicial conclusion that is outside of the scope of her authority in order to assign me a mental

health counselor, instead of directing me to the whistleblower office to investigate the picture of

my former warehouse boss from Norcal on the Socal university law school career office page,

and also instead of taking action against the "food safety: issue in dorm housing under her control

which led to my suspension later on (**7:24-12:27**).


**3. (12:30-20:26)** Based on Mr. Gherini's response in Doc. #57, I ask if he is struggling with the

"theories and plausibility," to which he replies by asking about the theory behind the "unofficial

medical diagnosis (**12:30-14:45**).  While Mrs. Cardenas' decision to wrongfully perceive me as a

protected class is not a claim in itself, student dorm housing officials nevertheless do not have

authority to make medical diagnoses within the "strict construction" of their authority unless they

are a certified psychiatrist.  Instead, the "unofficial medical diagnosis" line of inquiry serves as

corroboration for Mrs. Cardenas' refusal to direct me to the whistleblower office and then breach

the duty of care related to safety in dorm housing by ignoring my inquiries related to the food

safety issue (**14:50-18:38**) (*Doc. #129 pg. 235-236*).  The theories relevant to this line of inquiry

are the breach of the duty of care as well as strict construction, the "unconscionability" of

irreparable injury to my young-adult life's time and efforts, or possibly even "retaliation."  The

irreparable injury precedent I cited in case documents is derived from *US v. Carroll Towing (159*

*F.2d 169 (2d Cir. 1947)*).  Just as in the previous conference, Mr. Gherini projects that

"participating in the threat assessment hearing" was my issue "because I wanted to record the

hearing."  If Mr. Gherini read the case documents more closely, he would know that I am willing

to resume the threat assessment hearing if the unlawful conditions placed on the university's

willingness to resume the hearing would cease (1**8:40-20:26**) (*Doc. #125 pg. 21-25*).  Why would

someone participate in any process if participation in that process depended on unlawful

conditions that were artificially placed on that participation?


**4. (20:27-27:00)** Mr. Gherini continued by asking me about the "university software" line of

inquiry relevant to request for relief 1 and the "handshake account" line of inquiry relevant to

request for relief 3 (**20:27-22-00**).  If Mr. Gherini were paying attention and taking effective notes

about his own questions during the previous conferences, he would know that I removed request

for relief 1 in Doc. #16 and that the purpose of request for relief 3 is only to serve as

corroborative evidence.  In my first conference from point 2 above, I mentioned to Mr. Gherini

that requests 2, 4, and 5 were the major areas of concern to focus on.  Nevertheless, Mr. Gherini

was more interested in avoiding questions about the most important case facts, and he instead

asked me about requests 1 and 3 in the most detail, despite their overall removal from my claims

(**22:14-23:30**).  I even implied that we should be talking about more important case matters at this

time (**at 23:05**).  I try to bring the focus back to more important facts, such as the picture of my

former Norcal warehouse boss found on the law school's career page relevant to request for relief

5 (**23:32-27:00**) (*Docs. 50 & 51*).


**5. (27:05-31:30)** Mr. Gherini asks why I cannot disclose more about the unknown retaliation

issue, to which I indicate that those materials should be considered as protected trial-prep

materials by searching for more information I could disclose so he could "assess the quality" of

the claim under FRCP 26(b)(5) (**27:05-28:13**).  I mention the fact that the law school's career

office is "the part of the university I am most interested in," which is directly relevant to my

former Norcal warehouse boss' promise to retaliate against "my future" (*Docs. 50 & 51*). Alongside the disclosures relevant to request for relief 5 being claimed as protected trial-prep materials, I have already experienced in my life "the reasonable expectations" that would come with releasing the information before I am sure doing so can be done "securely" (**28:15-29:30**). My "other" claims to federal jurisdiction include (1) my audio recordings under the *Steffel* theory for exhausting judicial remedies, and (2) the irreparable injuries to my young-adult life's academic and free time as well as my financial aid qualifications under the *Carroll* theory (**at 29:50**). Mr. Gherini follows by asking me if I have a response to the "Amd. XI" defense, to which I raise the construction of the amendment as I described in point 2 above for the second conference (**29:57-31:30**). I ask Mr. Gherini if he has read the amendment and "who" it precludes from bringing federal claims against a State agency, because I am a citizen of CA and UCI is located in CA. According to the construction of the amendment, it does not preclude my claims. In the cases raised by Mr. Gherini in Doc. #57, the respective courts specifically acknowledge the language of Amd. XI (*Doc. #126 pg. 12-13*).

**6. (33:00-37:45)** Mr. Gherini asks if there is anything else I would like to talk about, to which I start reviewing the things we have already talked about given his short-term memory when it comes to "understanding" case "information" as demonstrated throughout my case (*Docs. 65, 68, 70, 77, 79, 83, 87, 90, 96, 117, 122*). Mr. Gherini asserts that he "does not agree" with the relevance of the unconscionable negligence theory, to which I reply that he previously said that he didn't even know what it is, and he agreed (**33:00-34:15**). I would highlight this statement as more corroboration of Mr. Gherini's lack of credibility when reading case documents and in making defenses, as demonstrated throughout my case and in our conferences (a**t 17:34**). I repeat to Mr. Gherini in this conference that we need to "schedule a larger window of time" to eliminate the lack of clarity (**at 35:30**). However, Mr. Gherini instead chose not to schedule another conference and chose to make unfair defenses based on an unclear "understanding" of case "information" against FRCP 8(b)(2), 8(b)(5), and 11(b)(4). Mr. Gherini's choice not to schedule

more conferences for clarification while claiming a defense based on his own poor understanding of case documents, paired with the direct evidence of that poor understanding of case documents demonstrated in these audio recordings, proves that Mr. Gherini is either not a competent reader or he is intentionally avoiding the facts of the case.

February 14th, 2024

By: *Bobby Gonzales*

Robert V. Gonzales