1  Robert V. Gonzales
2  PO BOX 7804
   SLT, CA 96158
3  Telephone:   530-523-3822

FILED

CLERK, U.S. DISTRICT COURT

**04/10/2025**

CENTRAL DISTRICT OF CALIFORNIA

BY_____EC_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

8           **UNITED STATES DISTRICT COURT OF**

9         **CENTRAL CALIFORNIA, SOUTHERN DIVISION**

11  ROBERT V. GONZALES,              **CASE NO.  8:23-cv-01788-JVS(KESx)**

12              Plaintiff,

13        v.                          Timeline for Audio Exhibits

14  THE REGENTS OF THE UNIVERSITY      B(3-6), A(6), A(12), A(9)
    OF CALIFORNIA, Et. Al.

15
            Defendants.
16

Table of Contents

Summary                                                        Pg. 2

Exhibits B(3-6) UCI Student Conduct Hearings 2020              Pg. 2-12

Exhibit A(6) UCI Whistleblower Conference 2023                 Pg. 12-14

Exhibit A(12) UCI Threat Assessment Hearing 2023              Pg. 14-20

Exhibit A(9) Conferences with Mr. Gherini 2023               Pg. 20-28

Exhibit D(3) LTCC Preliminary Hearing 2025                    Pg. 28-33

Exhibit D(4) LTCC Final Hearing 2025                          Pg. 33-37

Exhibit D(6) Phone Call with LTCC Maintenance Department 2025  Pg. 37-38

- 1 -

**SUMMARY**

I have already appealed my university grievance procedure through the normal process and finished my term of suspension.  I am challenging whether the investigation leading up to it and the punishments issued were prompt, fair, and equitable.  The purpose of reviewing the Exhibit B(3-6) audio recordings is to demonstrate how Mr. Coronel, distorted several important statements in my suspension hearings in a way that influenced his determinations as well as those of members of the Student Conduct Review Board.  Most recognizably in points 7 and 9 below, I caught Mr. Coronel in several lies between his interim suspension report and my initial summary of the audio recording at the time.  There are major disconnects on the record that impacted my student conduct case compared to a hypothetical situation where those mismatches were not part of the record.  Below are also the timelines for my audio recordings of UCI whistleblower office investigator Kathie Allen (Exhibit A(6)), the private contractor hired by UCI Dr. Manny Tau (Exhibit A(12)), UC defense lawyer John Gherini (Exhibit A(9)), LTCC VP of Student Services Dr. Michelle Batista (Exhibit D(3)), LTCC student conduct official Keeley Carroll (Exhibit D(4)), and LTCC maintenance employee Danny Gonzales (Exhibit D(6)).  The only way to prove the lies alleged in my court filings is with these audio recordings.  When thinking of how I did not always communicate myself well, please consider the magnitude and pressure of the underlying facts instead. **I will file the audio files with the court by mail or in-person by the discovery cut-off date on July 18th of 2025.**

**Exhibits B(3-6) Student Conduct Hearings**
**12/3/2020 11:59**

**1. (2:50-3:13)** Mr. Coronel introduces himself as "the Associate Director of OAISC."  I found and still find it unusual and questionable that an office manager was and still is personally managing my case.  Wouldn't a student conduct case normally be assigned to a staff investigator?  What about my case caused it to be singled out by the Associate Director?  What is more

interesting is that I have been told several times by other office staff is that he is "not the Associate Director," just an office investigator.  I was told this once over the phone on September 5th of this year when I initially contacted the OAISC to start the process of lifting the academic hold.  I was also told that he isn't the Associate Director at an unknown time between 2020-2021, which led to me ask this year.  I don't think he has been demoted since that time, but it is either that or he was just lying instead.  The first 30 minutes consist of my questions about the process.

**2. (25:16-26:02)** I mention the unusual, cryptic circumstances on campus to Mr. Coronel for the first time, in the format of "privacy and confidentiality issues for the university."  He responded that the OAISC will highlight that issue, and put it aside to come back to it later.  Obviously, they never did.  In normal circumstances, a student conduct officer would take priority over gathering any information that may be legally sensitive for the university.  The OAISC did express as much interest in the weird, unusual circumstances I experienced on campus as I received from Mr. Coronel back then, but I was never asked about the topic again after that.  What about my case made it so that "privacy and confidentiality issues" were repeatedly ignored by other university officials beforehand, and was again not receiving a fair and thorough investigation by the OAISC back then and now?

**3. (29:09-30:59)** We spent minutes ten minutes leading up to this time discussing the "releasing of sensitive information" in a hypothetical situation where there is a credible threat of retaliation for doing so, in length.  The actual retaliation which I was drawing the hypothetical from was at a past job I was referring to, by a coworker, related to pointing him out for bringing hard drugs to the workplace.  The "sensitive information" I did not release at that time was who that coworker was, due to fear of retaliation by a hard drug user who could easily determine when and where he was revealed to the boss.  I did not try to bring a case at that time because I was not ready, but I still have the records.  Mr. Coronel eventually states that he has seen the situation I described before, and he would not determine that withholding information in that case is a form of refusing

DEFENDANTS RULE 26 DISCLOSURES

to comply with the investigation (**at 30:04**).  While my hypothetical question certainly requires far more clarity than others I've asked of Mr. Coronel, the conversation leading up to this time was never about sensitive information released "by the university," but probably instead to it. Suddenly questioning whether I was talking about the university releasing sensitive information after ten minutes of discussion about that topic tends to follow a pattern commonly seen almost anywhere as attempting to change a topic by focusing on small parts of the idea in question or using slightly different language.  I may have had a clearer conversation if I mentioned "retaliation threat [by a coworker] in that situation."

**4. (33:36-34:47)** My "Primary RLC Coordinator" for Arroyo Vista housing, Janet Cardenas, alleges in the initial report to OAISC that she never saw any of my many emails over two days in Exhibit B(1) University Subexhibit B about the food safety hazard situation in my dorm.  The reason I was given is that she was not on duty during those two days.  However, Mr. Coronel states that my attempts to contact the Arroyo Vista housing staff member "are not pertinent to" the conversation, despite its role leading up to the incident.  I am not sure why else housing staff managers from different communities would "rotate" to oversee housing communities, other than the one they are assigned to, unless they are covering for someone who is off duty.

**5. (34:57-36:00)** Arroyo Vista housing staff appear to have made a separate version of the police report.  I'm not sure if it is a normal university process to write a supplemental report about information forwarded to them by police.  If that is normal procedure, it is certainly unusual and questionable due to its highly exploitable nature as shown by other mismatches between my final suspension letter and the audio recordings.  Interestingly, Mr. Coronel changed his answer from what he told me during this hearing in his final suspension letter when he stated that it was the police report and not a housing report of information provided by police, as shown by the fourth "NEXT" in Exhibit B(1) University Subexhibit E.  Which is it?  I don't think student housing writes separate, supplemental reports, but either they did or he was lying.  Why play telephone,

instead of forwarding the PD report or other direct information?  If the unknown housing report statements about being kneed in the face at the end of the fight match those of the university PD, then I stand by the notion that it is an inaccurate, "suspicious" representation of my statements as can be shown by any bodycam footage.

**6. (36:28-39:47)** At the time, I readily admitted that I did a poor job at defending myself and deescalating the situation, and I stand by that.  I also stated that I "initiated the situation" by getting the attention of the individual with whom I had the fight when I shoved his shoulder, given I was not receiving a reply from housing staff about the food safety hazard situation he was creating, and he was not replying to anything I said for the month leading up to that week.  However, the other individual "escalated" the situation.  Pushing on someone's shoulder to get someone's attention in that unusual situation still does not warrant the kind of escalated response I received, as directly objected to by Mr. Coronel.  At **38:13**, I begin to describe how I stopped being kneed in the face many times over, which is my FOURTH dispute from Exhibit B(1) University Subexhibit E.  In the fight, the other individual did not express an intent or desire to de-escalate until the point when I had stopped him from kneeing me in the face, after the fact.  In the fifth paragraph of the "Summary" in his final suspension letter, Mr. Coronel makes his determination largely based on the other individual's outburst I describe shortly thereafter, which is my FIRST dispute.  In fact, the exact etymology of the other individual's statement that "[he] wouldn't do" anything like that after the fact, but right before calling 911, seems to indicate his thoughts about whether he himself thought of himself as the aggressor, especially given his immediate escalation of the level of force.  I copied Mr. Coronel's statements about what the other individual's late outburst "indicated" about what he "wants" from the final suspension letter and pasted them into B(1E.1).

**7. (40:29-44:18)** I state that the situation basically ended with me punching the other individual in the face no more than five times.  I am not claiming that I did anything good to de-escalate the

situation while caught off guard wearing socks on a slippery floor.  I am claiming that the other

individual's expression to de-escalate within the timing of events shows that it was a false

statement, but Mr. Coronel determined that it was a genuine statement.  I go on differentiate

between forms of "choking" beginning at **41:49**, of which hand maneuver and expression I

described amounts to my attempt to get off the ground.  However, Mr. Coronel directly lied in his

final suspension letter by saying "the choking was equally done," as mentioned in the EIGHTH

dispute from B(1E) and demonstrated at this moment in time.  Mr. Coronel even mentions

"knees" to the face at **43:30** as mentioned in my FIFTH dispute, which I did not know until after

the hearing.  Until the end of this part of the clip, Mr. Coronel says that he would have wrote

down that I somehow kicked the other individual from the ground while being kneed, before

"torquing" his leg in order to escape, which would be impossible.

**8. (46:46-53:10)** I was kneed in the face more than 10 times, but I don't remember it being

mentioned in my final suspension letter even though he repeated it back to me at **48:10**.  At

**47:05**, Mr. Coronel repeated that he wrote the same impossible way for the event to occur after I

just corrected him, in the form of me hypothetically kicking the other individual in the chest from

the ground after having slipped, before getting back up.  He may have been double checking, but

what else would he have written down if I had not slowed down to correct him here.  From **48:52**

to **50:47**, I thoroughly describe the difference between stopping the event of being kneed in the

face and "putting him on the ground" by any other means.  Nevertheless, Mr. Coronel's final

suspension letter expresses partiality towards the other individual by downplaying the way I was

kneed in the face and oversimplifying minute details related to escalation and intent.  The

insistence that I "put him on the ground" without consideration as to how and why I did the act

using those particular words is probably indicative of this same pattern.  Mr. Coronel seemed to

hold my recall of the events to an unreasonable standard of expectation as it relates to the minutia

of individual body movements.  The "legal questions that I don't know" which I have in regards

to this particular incident have to do with the "weight" of "safety" related case information which

I had initially provided to Arroyo Vista housing staff information in in B(1B).

**9. (58:54-1:05:50)** After going through his timeline of the incident one more time, we began to discuss what led to the fight.  My SECOND and THIRD dispute with the final suspension letter has to do with the misrepresentation of whether I felt there was an urgent threat to my safety B(1B & E.2&3).  "A previously established pattern of behavior" was not a good description of the other individual's decision to ignore me for a month and then start moving my food around in the dorm fridge.  After referencing the emails where I described the food safety issue in B(1B), I was asked whether anything requires the other individual to respond to me in normal circumstances or any circumstance at **1:01:35**.  At **1:03:42**, I am asked about distinguishing a threat of imminent, physical attack from a question of safety related to the unknown condition of my food.  I do not know what else may have happened to my food when it was being moved around, and that unknown condition of my food would have the same effect whether I am ingesting it at the time or a later time like Mr. Coronel asked about.  Mr. Coronel follows at that time by posing a hypothetical where someone was instead tampering with my food while in front of me.  In a less educated environment, the hypothetical Mr. Coronel posed may be more likely, but an educated person at a university who desired to tamper with food would most likely not do it in front of their intended victim.  In Mr. Coronel's determination, only food-tampering done in front of the victim would qualify as a food safety hazard.  My "supposal statement" referred to in B(1E) is when I "suppose" after **1:04:00** that tampering with my food behind my back or not is not an imminent threat in the same way that being violently attacked is.  "All my references back to circumstances" was not a good description of Arroyo Vista housing staff's role in not answering my emails and leaving me to my own devices to handle the food safety hazard (B(1B)).  The purpose of this fact is to demonstrate that Mr. Coronel misrepresented my statements about whether I felt there was an urgent concern for my safety while ingesting my own food.  However, given my emails with Mrs. Cardenas which were sent for two days before the fight occurred, Arroyo Vista's role in contributing to my response to the unresolved food safety

hazard was negligence in their role to take administrative responsibility over the matter.

**10. (1:06:35-1:32:25)** After going over another set of allegations from two separate interim suspension letters which I had refuted in emails after asking more questions later, I briefly made emphasis out of the most serious one at **1:10:07** by emphasizing that the definition must be closely paid attention to.  I was originally accused of violating a terrorism policy (UC PACAOS 102.24), which I disputed in my emails based on the term meaning violence based on political motivation.  Another example of an accusation I had refuted, related to "flags" and "private decorations in dorms," was not taken kindly by a different "Resident Advisor" housing staff member when I told him to go look at other dorms like I had, leading up to the week when the other housing staff member began to ignore me.  I thought my Resident Advisor might steal my flags, so I kept photos of other private decorations around Arroyo Vista.  In my OAISC SCRB appeal letter (Exhibit A(3)), the review board for my case accepted most of my descriptions on these separate matters and agreed to overturn many of the accusations from the three interim suspension letters.  However, my response to the evidence does not warrant the terms of a permanent disciplinary probation, given that I have been falsely accused of terrorism, for one.

**11. (1:44:24-1:58:49)** I was told I would be given an exception from the interim suspension requirement to leave my dorm immediately for one weekend, but then I was coincidentally identified as someone who came in contact with a person who tested positive for COVID-19 on the day after this hearing.  I kept a separate audio recording of the quarantine process call as well as several emails with campus social workers and the Dean of Student Services.  This enabled me to go to quarantine housing, after staying in my car on that Monday night before I saw the messages related to quarantine.  I was under the understanding that the mandatory quarantine period was two weeks.  However, I was "cleared" after one week instead, and I was still not allowed to gather my property from my room after my week in quarantine housing was up, until December 19th, 2020.  I was expected to pay accommodations expenses for an period of time

unknown to me at that time, or drive between NorCal and SoCal while waiting to collect my property. Instead, I stayed in my quarantine unit until I was told to leave, went back to my dorm until I was told to leave, stayed another night in my car, and then learned that my Parents have a friend in San Diego. In my timeline of unusual incidents on campus probably related to confidentiality issues, I *also* documented the apparent slow-walking of the removal of the other individual from the dorm. He came back into the dorm over several days to periodically remove some of his kitchenware at a time to somewhere else, sometimes alone and other times while escorted by campus PD. After the fight, I was asked by the campus PD officers if I request to have him removed from the dorm, by their "power" and not the university's according to Mr. Coronel and housing staff shortly after **1:56:50**. This exact question about confidentiality issues is supported by the fact that the other individual, Kidra Setayashi, did not attend the appeal hearing which I recorded almost one year later, because he had already graduated according to the Student Conduct Review Board, possibly while staying in a dorm for the rest of the year after all. Nearer to the end, Mr. Coronel considered giving me the weekend to find a place to stay other than student housing, but he later sent me emails the next day which directed me to leave after I made contact with a campus social worker.

**12/16/2020 15:06 & 15:23**

**1. (13:11-18:05)** The first **6:30** are spent reviewing the procedure. The other three recordings do not contain a significant percentage of my disputes, but they may be useful to provide additional context. Once again, I did not dispute the allegations of events, I challenged their premises. At the start of the clip, I explained that I did not have enough time to look through the housing resources I was given when I was asked about why I did not find another place to stay within 24 hours. It is worth mentioning that the week of Friday December 11th, 2020 was during finals week, adding that much more struggle. The interim suspension letter provided language for an exception "to be on campus in order to attend classes," which I was doing remotely like everyone

else at the time.  In order not to attend my finals in disorder from a public parking lot, I tried to rely on this language from the interim suspension letter as a means to stay in the dorms and attend classes in an orderly fashion.  After the first 24 hours, I did not search for other housing because I thought I would do my best to utilize the exception in order to stay in quarantine housing and then my dorm for the internet and to have orderly finals.  Before any of this starting at **4:30**, I refer to a hypothetical situation where I could not find public internet or reach Mr. Coronel before the hearing.  I highlight this statement partly because I refer to it as a "privacy and confidentiality issue," given other unusual events I had been subjected to on campus leading up to that point.

**2. (23:55-29:05)** At **26:10**, I list the four reasons why I did not look through the housing resources provided to me enough to make any contacts, which resources included options like AirBnB.  I mentioned "finals" at **27:25**.  At **28:35**, Mr. Coronel expresses the urgency of acting swiftly if there is "a danger posed to the community" when talking about how action was taken against me during finals, but he did not seem to take this principle into consideration when it came to the removal of the PD-determined aggressor from the dorm I was in at the end of the December 3rd hearing.  I would highlight the parts at **4:30** again here, with the addition of being in a position to take my finals with full mental capacity.  If I was "cleared" to leave in the middle of finals, before the two-week quarantine was over, was I really under quarantine?  Or was I graciously "given permission to stay" there for the first week, but then harshly thrown out at the worst time possibl with foresight that it was finals week given everything else?  Similarly to the other individual, I could have been removed from housing in a gradual process, like after the quarter ended.

**3. (33:47-34:29)** I mention that I have been keeping an audio recording of Mr. Coronel, to which he demanded I stop recording the official university proceeding.  He also denied me the right to "record any meeting I ever have with him," which would give him even more leisure to produce mismatches between what someone talking to him says and how he quotes them in his job.  What

is the American justice system without the right to document authentic records?  I would also add that my car was making wheel bearing noises at that time, which I learned during 2021 is not extremely urgent and dangerous unless it is getting louder.

**4. (00:01-8:30)** The audio when I resume recording is rough.  As the week of Wednesday December 16th, 2020 moved forward and I was told to leave my dorm again, I eventually looked at accommodations options I was provided and elsewhere on the internet.  Mr. Coronel said something about my description of the "circumstances" I described, starting at **23:55** above, which caused me to resume recording.  He even accused me of "not being communicative" with campus social workers (**3:30**) when I was the one who was not receiving a reply (**3:22**) "maybe" within the last day or so at the time.  "Directed not to take my finals" was not a good description of Mr. Coronel's prioritization of the suspension timeline, abuse of quarantine procedure, and double-standard with the other individual in the dorms over the timeline for my finals, or the option to just finish the quarter first (**4:19**).  We did not end up "digging into a burden of proof" for my poor choice or words, nor my "options" for accommodations.  I ask to dig into these questions at **7:09** and then again at **7:56**.  Mr. Coronel simply repeated that it was my choice not to spend money that I did not have on hotels for an unknown period of time at that time.  In the most oversimplified sense, the "choice" was mine, but what choice is a penny over a hundred dollar bill?  I attended the second Zoom hearing from my car in the Starbucks parking lot across from the northeast side of campus, where I had access to wi-fi.

**1/5/2021 14:20**

**1. (00:01-12:13)** I had a third hearing about a martial arts sword I brought to campus.  I was not aware that the campus could provide an exception process for weapons, I had originally thought I would bring it and make my case like I did if it ever became a problem.  Despite the serious disconnects in the record, Mr. Coronel accepted that I refute the allegation as a safety concern for

the campus, under another policy which is commonly compounded by "zero-tolerance" requirements as with the fight.  I apologized for my poor, reactive choice of words, but I even offer the university an 'increasingly in-demand' service, among other prospective assets (**4:03**). Apparently, interestingly, this third hearing for the weapons policy was held after I submitted an appeal of the final suspension letter, which I did not remember until after reviewing the audio for the first time in 2023/2024 (**11:36**).

**Exhibit A(6) Whistleblower Conference**
**11/17/2023 14:03**

**1. (00:00-7:43)** I begin the whistleblower conference by stating that I want to overlook the incidents with the student conduct office in 2023 in order to focus on the list of matters related to the "spy novel I lived through in 2020" (**00:00-7:43**).  I also remark on the absurdity of the first whistleblower report where it is stated that I alleged no policy violations (**at 1:40**) (*Doc. #130 pg. 63*).  The list of matters included (1) a "break-in" issue which campus law enforcement ignored at the time (**2:01-3:07**), (2) abuse of the "quarantine procedure" through the student conduct office that resulted in "entrapment" as it related to student housing and my duress at the time (**3:10-3:59**), (3) "negligence" by Janet Cardenas on the duty of care related to safety in the dorms in University of California Guidelines on Harassment and Discrimination G(4)(a) before the student conduct issue (**4:03-4:34**), (4) the prejudicial conclusion to direct me to a "mental health counselor" instead of to the whistleblower office to investigate the matters in 2020 (**5:25-6:36**), and (5) "student confidentiality issues" related to the "pattern"-like prejudicial conclusion that seemed to follow me from my community college (**6:37-7:43**).  In my case filings, I listed a series of relevant student confidentiality policies (*Doc. #34 pg. 8-14; Doc. #141 pg. 22-23*).  I did not mention the picture of my former Norcal warehouse boss on the university law school's career office webpage at this time, nor did I include it in my whistleblower complaints, because I wanted to see how the whistleblower office would handle smaller matters before releasing the more

sensitive materials.  I also mistakenly mentioned the break-in issue in the context of the decision to assign me to a mental health counselor, when Mrs. Cardenas' decision actually stemmed from the picture of my former boss on university webpages (**at 5:05**) (*Doc. #131 pg. 202-209, 235-236*).  During the conference, Mrs. Allen refuted area of concern 1 as a police issue despite the campus PD's ignorance to it at the time, and she refuted area of concern 2 as a student conduct issue.  However, in both of the whistleblower reports, all of my inquiries were wrongly grouped as either police or student conduct issues (*Doc. #130 pg. 63-64*).  Areas of concern 3-5 occurred before there was a student conduct issue (*Doc. #131 pg. 193-201*).

**2. (8:36-21:48)** Mrs. Allen asked if I would like to know more about how the whistleblower office would handle the first issue, but in my state at the time of sifting through the documents for the first time since creating them, I replied by describing part of the likely cause of how the picture of my former Norcal, Marine Corps warehouse boss found its way onto university webpages (**8:36-9:45**).  Then, I described the elements of how Mrs. Cardenas prejudicial conclusion followed the pattern of issues I would have at my community college (**9:49-10:38**).  Next, Mrs. Allen was more interested in asking me about the Office of Information Technology "university software" issue in 2023 instead of my complaint documents about the issues in 2020 before there were any student conduct issues, which happened to relate to student conduct issues (**11:16-12:08**).  Then, Mrs. Allen projected on my inquiry as if I was asking the whistleblower to "investigate LTCC" and not the pattern-like student confidentiality issues which occurred at the UCI campus (**12:10-14:46**).  I mention that LTCC's harassment by breach of policy on student confidentiality may be "harassment" with a "homicidal" intent, given that I have expressed suicidal ideations to the staff involved at LTCC (**16:00-17:05**).  Mrs. Allen asks if there is anything else for the whistleblower office to consider, to which I replied with the first two sources of corroboration for the break-in issue: the Arroyo Vista maintenance log and the complex's lead meaintenance employee named "John" (**17:45-19:47**).  Next, I mentioned the third source of corroboration for the break-in issue: the "GroupMe" posts for my dorm by the undergrad

president of the UCI Resident Housing Association (**19:50-21:48**).


**3. (21:54-32:55)** Next, I describe the circumstances of the quarantine issue through the student conduct office that resulted in "entrapment" as it related to student housing and my duress at the time (**21:54-24:06**).  Basically, I was contact-traced a week after coming in contact with a campus law enforcement officer who had the virus according to the contact-tracing audio recording I kept at the time, but that was not the issue.  The issue was that the student conduct office stepped into the matter and removed me from quarantine housing after one week, while the quarantine period established at the time by the CDC was two weeks.  These events placed me in a state of duress described in my Exhibit B(9) declaration (*Doc. #127 pg. 32-33*).  Next, I describe the circumstances of the food safety issue that led to my suspension (**24:34-26:48**).  Basically, Mrs. Cardenas ignored my inquiry, so I tested whether she would take another dormmate's inquiry seriously if I did the same thing that was happening to me a few days later, and coincidentally, the housing employee assigned to confront me tried his best to avoid the topic directly, which is indicative of collaboration by university staff of a willful, knowing double-standard related to the duty of care related to safety in dorm housing (*Doc. #127 pg. 35-37*).  Then, I describe the conflict of interest set forth by university policy which requires the student conduct office to investigate its own wrongdoings (**28:18-29:10**) (*Doc. #127 pg. 17-18*).  Whistleblower Policy Section IV(G)(7) prohibits conflicts of interests in whistleblower investigations, such as requiring the student conduct office to investigate its own wrongdoings.  Requiring the problem office to investigate itself for its own hostility to me and my inquiries is especially defective, absurd, and opposed to university policy.  The meeting concluded with Mrs. Allen expressing an inaccurate bias when I tried to demonstrate a central issue with law schools (**at 30:36**).


**Exhibit A(12) Threat Assessment Hearing**
**10/10/2023 10:11**

**1. (00:01-9:10)** The first ten minutes of the threat assessment were spent by Dr. Tau and I circling around each other's questions.  Dr. Tau asked me for my social security number for identification, to which I requested to select an alternative form of identification.  Instead of addressing my questions about possible alternative identifying information, Dr. Tau spent the first 3-5 minutes evading a question reasonable for protecting my personal information of whether he could use an alternative form of identification.  Meanwhile, I did not give him my social security number for the first 3-5 minutes in an attempt to ask him to select another option.  At one point, I asked Dr. Tau specifically if there is "other information he could use" instead, and he answered "yes" from between "about 128 pages of documents" from the university where he could have possibly accessed an alternative form of identification for a hypothetical background check other than my social security number (**3:06-3:41**).  My question was whether he could use identifying information other than my social security number, and he providing several evasive answers instead of addressing the question directly, while in my case I was simply hoping to provide any information other than my social security number (**3:06-4:59**).  Immediately thereafter, I asked whether my threat assessment was focused on specific "policies," presumably those of the university given that the threat assessment is governed by university policies.  Instead of addressing my question directly, Dr. Tau projected several apparent elements of clarity onto my question by asking whether I was asking about university "documents" and not university policies, and whether the policies I was asking about were those of "the university."  This continued for several minutes (**5:36-9:10**).  The purpose of my question was to determine whether any of the policies I was falsely accused of by the university and therefore had overturned, such as "terrorism" in the place of "physical abuse," were once again wrongly being questioned (**8:20-9:05**).  After the large, overwhelming pattern of bold policy errors made by the university, I suspected that I needed to clarify whether the university was reviewing incorrect policies.  Dr. Tau's alleged questions for clarity evidently did not seek any clarity, and they repeatedly projected to peripheral elements related to each question that were not even being asked about such as "documents" or an unrelated entity's policies.  My intent of highlighting the first ten

minutes of the threat assessment is to prove that whatever Dr. Tau's intent was in giving several nonanswers to my questions, it was not to seek clarity, and this evidence goes towards proving whether Dr. Tau can speak about the contents of the threat assessment or even just answer questions credibly. I, however, am not a professional, and I almost always answer the questions, unless the intent of a question itself should be questioned.

**2.** (**18:24-19:50**) Dr. Tau asked me whether I have ever been arrested, convicted of a crime, or accused of domestic assault which is a perfectly normal part of this process. However, I have not been, and the incident at the university is an isolated one in my life since I was the one who was assaulted. Therefore, I felt the need to point this out, as well as the fact that the university's lawsuit record is not clean compared to my legal records in life. The University of California, Irvine has been sued in the past for extremely bold illegal activity which is being asserted in this case as "unquestionable" (*Doc. #57 pg. 3*). Some of these lawsuits include retaliation against a professor for pursuing previous litigation, as well as a settlement with the City of Irvine for ignoring development and planning codes for recent building projects. After I answered the questions Dr. Tau asked and made my statements about the university's legal record compared to mine, Dr. Tau expressed a minor form of microaggression by repeating the questions as if he had not heard them the first time or as if he may project that he did not believe my answers. Whatever Dr. Tau's intent was in repeating the question, I would be really interested to find out, because I am raising it in this timeline for its underlying perspective of "unquestionable," micro-aggresive double standards of law.

**3.** (**19:55-21:45**) I first admonished Dr. Tau not to "do the same thing as Mr. Coronel" by "misrepresenting my statements here" for the first time. At this time, I did not inform him that he is being recorded so I can prove if he does do the same thing as Mr. Coronel, since I would have no other way of doing so if he did. I did always appreciate when Dr. Tau actually did, finally "focus on my questions."

**4. (21:47-23:00)** Dr. Tau asked me to characterize myself with short answers, which is a normal part of the threat assessment process.  However, his responses to my first characterization of myself as "questioning authority" goes towards proving his credibility when making official requests and demands.  In my life, I document people who oppose me out of no purpose and intent whatsoever other than bias, if I can prove it.  Dr. Tau evidently could not recognize that "questions authority" is a perfectly coherent, rational answer to his question about characterizing myself, and he seemed to have to attempt to try to cause me to change my answer for no apparent reason other than he didn't like it.  Dr. Tau blindly opposed me with bias so deeply that he actually demanded that an issue with my answer was that it was not "a three-word answer" (**22:24-22:26**).  I am not familiar with any requirement for a self-characterization in a threat assessment to be a "three-word answer," and to attempt to demand such an unusual requirement of me at that time can only lead a reasonably informed person to suspect that his opposition to my answer was primarily driven by an unusual bias to oppose me to maintain a position of authority and false correctness.  I am not sure of the nature of the position of correctness and would be interested to inquire more into the intent, but I am fundamentally sure of the unawareness that must have driven this unusual behavior.  This is a common phenomenon I have experienced throughout "my life, mostly in official settings where the person in a higher position of authority has a simple "cognitive dissonance" need to maintain their position of authority and sense of correctness.  This is something we have all experienced.  For the next 20 minutes of short-answer questions after this, Dr. Tau jumped at every opportunity to limit the scope of my answers every time they slightly deviated from his apparent liking of short answers, in ways that felt unusually controlling to me as the subject.

**5. (33:09-35:40)** Dr. Tau asked me two separate questions: whether I have had any "extreme depressive or suicidal thoughts."  My answer was and is yes due to the uncertainty of how my last 11 years of life's efforts have been spent and where my future is heading as a result of university

negligence, irreparable injuries, etc.  I admonished the District Court of this fact somewhere early on in my pleadings (*Docs. 1-21*).  Nevertheless, Dr. Tau, a clinical psychologist, ignored this high-standing factor in the total equation, prevented me from moving forward with the hearing by preventing me from proving any legal issues if necessary, and then compounded the offense by collaborating with the student conduct office and legal team to attempt to intimidate and coerce me not to prepare to prove any legal issues if necessary as a condition to resume the threat assessment (*see Ex. A(9-12) Doc. #127 pg. 22-26*).

**6**. (**36:20-38:45**) At **36:20-36:50**, I am asked if I have spent several sleepless days which I did not at that time, but at the time of organizing this timeline, I spent nearly the last three weeks in a state of extreme sleeplessness during October-November 2024.  At **37:15-37:45**, I am asked if I have any obsessive thoughts which I did at that time, but at the time of organizing this timeline I spent the same period of time as the sleeplessness obsessing over the elements of indicating to my psychology homework on the record, and community member's apparent, cryptic knowledge of "the government case ruining Tahoe" described back to me by random people on the streets in my hometown!  At **38:15-38:45**, I am asked if I am having any paranoid delusions or hallucinations which I did not at that time, but at the time of organizing this timelineI am basically losing my mind over the elements of "the government case ruining Tahoe" being described back to me by random people.

**7.** (**53:30-58:28**) Upon the end of segment 1 of the threat assessment, and the beginning of the "contextual phase," my threat assessment rather swiftly came to an end evidently because Dr. Tau did not personally like the way I answered the first contextual question.  I was asked a "teaser question" about causing harm to others, and the response I gave was one that was uninformed about the concept of teaser questions.  Ultimately, I stated that as a student of criminology who has a form of intermediate experience interrogating people myself for my own purposes, I basically thought his question was funny to me because I wouldn't think it would draw out useful

information for the intended purposes as a student.  Dr. Tau corrected me, however, instead of correcting the content of the idea presented by an uninformed student, he was evidently more focused on the symbolic nature of my statement that I, a student, was attempting to correct him a professional doing his job.  The "combativeness" in his own tone caused me to become concerned over whether his documentation of my answer would be "oversimplified" (**56:00-57:00**).  My intent was not to purport a peripheral symbol of "being more right" than Dr. Tau, it was to purport the central content of the idea that I would not have asked the question the way he did if it were up to me, although I be a student and I am very aware of that.  Dr. Tau was more interested in the peripheral symbolism of a challenge to his intelligence by a party who any reasonable person would not even worry about any such interpreted challenge, so he quickly moved forward with a second question, asking whether I wanted to "end the threat assessment" necessary to move forward with the processes and possibly the rest of my life I had spent the previous 11 years working towards (**57:17-57:52**).  No reasonable person would presume that I want to cut off my own future over a falsely interpreted mental challenge with no equivalency of foundations in fact whatsoever, but instead, Dr. Tau was more interested in the absurd, and attempted to project back at me that I am choosing to cut off my future for making a statement he didn't like.  More importantly, he moved forward with his decision with the "suicidal ideations" factor looming in the background, as a clinical psychologist.  Projecting to whether I want to cut off my last 11 years of life's efforts and potentially my entire future over a falsely interpreted, extremely weak mental challenge corroborates the pattern of "a control freak" demonstrated in point 4 above, but to such an extreme degree with crippling results one or more years later as demonstrated in point 6 above.  Dr. Tau's projections to attempt to destroy my life's efforts and potential future over something to the effect of 'putting my periods in my sentences on backwards' corroborate the patterns of discrimination and possible retaliation or political bias which I have proven throughout my case.  Dr. Tau's "jump" to assume I want to end the hearing and cut off 11 years of effort in my life over someone who "questions authority" and their "combativeness," and to impose such a severe consequence upon someone who fundamentally questions authority over

any notion of combativeness if their questions of that authority have a foundation in reasonableness, corroborates the pattern of "a control freak" demonstrated in point 4 above (**57:53-58:28**).

**8.** (**58:33-1:09:39**) For ten more minutes, the conversation went in a circle where I was asked if I want to end the hearing and I kept answering that I never stated or indicated any such idea. Declaring that the asking of questions is combative and that I cannot ask questions 'or else' is projection at best. Asking questions is not adversarial or combative, and raising a voice over a false accusation is normal. Inducing a combative tone in someone as demonstrated in point 7 above by changing the topic of discussion among other means is also a form of projection. To demand that anything on the record from the beginning cannot be reviewed until the end instead of off of a fresh memory shortly after a moment in question, and can only be reviewed at the end 'or else' such a question is adversarial, is a form of projection, and it is not good record-keeping. It was only Dr. Tau who "wanted to end the hearing," by using sideways means to do so. For a clinical psychologist to impose such a consequence over a question of authority given that it was my first description of myself as "a questioner of authority" which he was informed of severely lacks correlation between "combativeness," "correcting the combativeness proportionally," and much more. Dr. Tau was also more interested in trying to change the topic about whether the event was a "hearing or interview" than discussing the substance at hand (**1:03:55-1:05:36**). Then, I reveal to Dr. Tau that I had kept an audio recording of the hearing, to which he responded by saying doing so is "illegal" under CPC 632 (**1:06:40-1:08:19**). To condition a future hearing by collaborating to prevent me from proving any of the above facts in a resumed hearing because I have no other way of doing so, (s*ee Ex. A(9-12 Doc. #127 pg. 22-26)*, is a form of obstruction at best. Dr. Tau did not give me permission to prove if he is engaging in any legal wrongdoing during the interview hearing, the one which I was not allowed to ask a final question in originally.

**Exhibit A(9) Conferences with Mr. Gherini**

**12/15/2023 12:52**

**1. (00:00-2:45)** Mr. Gherini starts off by stating that he does not "have authority" to accept service on behalf of university employees, despite acknowledging that my service to the Regents of the University of California Office of the General Counsel is service to those employees "within the course and scope of their employment with the university" (**00:45-1:00**)  My service was not addressed to Mr. Gherini, but instead to the Regents in compliance with their guideline for service of process published on their website (*Doc. #20*).  The Regents' legal team has set up one procedure for service of process and then seems to try to assert a "different," unknown procedure which leaves the door open for them to choose to either create a false appearance of accommodating persons who serve process in compliance with their procedure.  It would be hard for any person who is serving documents on the university to know what the alternative procedure under which Mr. Gherini "has authority" if the Regents' intentionally publish a different procedure on their website.  After discussing the service of process, Mr. Gherini shows that his initial "understanding "of my claims only extended as far as my threat assessment hearing with Dr. Tau (**2:00-2:45**).

**2. (3:00-11:30**) Mr. Gherini acknowledged that he "tried to read through some of the material I filed" with the court, which includes many more lines of inquiry other than my suspension and threat assessment hearing (**at 3:32**).  Mr. Gherini then asks me what I "want to achieve through the lawsuit," to which I answered with the list of remedies filed in my CV-66 form (**at 4:05**) (*Doc. #127 pg. 8*).  Despite stating that the issue related to request for relief 1 with my online university software account was removed from my case in Doc. #16, Mr. Gherini asked for clarity on the matter (**4:24-4:44**).  As an independently criminology student who has become intermediately experienced in forms of interrogation in the course of proving lies in my own life, I have found that such moot questions for clarity are often attempts to change the topic of discussion or distract from it.  While continuing to discuss my 5 requests for relief, I list

- 21 -

expedited resolution for my "academic hold" (request for relief 2), restoration of my "handshake account" university job application software (request for relief 3), inquiry by the university into "affordable housing issue" (request for relief 4), and inquiry by the university into "50 unusual coincidences on campus" (request for relief 5) (**5:00-8:50**).  Requests 4 and 5 were left undetailed at the time of this conference because I had not yet submitted any disclosures on those matters.  When discussing request for relief 4, I mentioned [my two job applications with Orange County] for developing and managing an affordable housing project (**9:00-9:50**) (*Doc. #98 pgs. 27-32*).  As the conversation continues, I allege that I have compiled evidence that the long-delayed plans to redevelop the "Las Lomas" apartment complex on campus conflict with affordable housing laws (**10:00-11:30**).  I only made a claim related to my initial request for relief 4 because, while I was removed from campus housing in a state of duress, the apartment complex caught my attention while I stayed in the parking lot there for a few nights in my car.  I have since removed the claims related to affordable housing from my case.  Mr. Gherini also did not ask for much clarity on the topics of my academic hold or the 50 unusual incidents on campus.

**3.** (**12:19-22:20**) I repeated that my case as filed at the time of this conference only covered disclosures related to requests for relief 1-3 (**12:30-13:23**).  Mr. Gherini follows by asking if I desire to return as a student at the university, to which I reply "absolutely" and clarify on my own more on the academic hold issue which is at cause (**13:35-14:24**).  My clarification involves a comparison to US CONST Amd. IV.  The academic hold involves a term of "permanent disciplinary probation," against UC PACAOS 105.03 (*Doc. #141 pg. 22*).  My comparison illustrates how a permanent disciplinary probation against university policy is much like an unlimited search warrant to search someone's person, property, effects, and papers at any time for any reason (**14:25-16:10**).  The academic hold with a permanent term of disciplinary probation not only violates university policy, it also constitutes an irreparable injury because I can only qualify for the financial aid which I spent my entire young-adult life working towards if "I am in good standing with the university" (*Doc. #130 pg. 31-33; Doc. #137 pg. 18-21*).  I follow by

mentioning how the Regents' centralized liability to "chase after" a "mess" of lawsuits at individual universities leaves no incentive for those universities to follow their own policies or other law (**17:22-19:13**).  Mr. Gherini then asks if I would resume the threat assessment hearing, to which I answered that I have "previously expressed" that interest and "I think the university has lost its authority" to conduct that process [by making a condition of the hearing to prevent me from gathering evidence against procedural due process under US PACAOS 103.10 (*Doc. #127 pg. 22-26*)] (**19:14-20:04**).  Mr. Gherini then asks if I will amend my complaint any more, to which I answered that "I will file more documents" not knowing that doing so will constitute an amended complaint (**20:33-22:20**).

**4. (22:23-33:28)** Mr. Gherini asks why I filed in federal court as opposed to State court, to which I answered that the audio recordings which constitute "authentic evidence" under "due process" are a major object to my standing in federal court under *Steffel v. Thompson, 415 U.S. 452 (1974)* (**22:23-23:44**) *(Doc. #56)*.  However, I did inaccurately state that public officials acting in the course of their duty are considered as "private persons" under CPC 632 (**at 22:40**).  Mr. Gherini asks about how to "move forward" and offers to help me "navigate the process" of my academic hold and threat assessment hearing within his discretion, (**23:50-24:35**).  I respond to his question and offer by saying "not even close" in the sense that the university has a serious burden to meet first, and I go on to discuss that the university has to take a possible "murder" issue related to request for relief 5 seriously in the whistleblower process for the next three minutes.  However, the university did not take the "unknown retaliation issues" seriously, and I have repeatedly discussed with Mr. Coronel via email that I wanted to resume my threat assessment hearing without a condition that violates the university's policy on procedural due process (*Doc. #130 pg. 12-13, 15-16*).  Mr. Gherini did not ask for any more clarification on the severity of the unknown retaliation issues, and instead began discussing the federal process for stipulating the service of process in Doc. #39 (**26:35-27:17**).  I go on to ask Mr. Gherini if he would be interested in scheduling discovery [conferences] in order to disclose matters relevant to request for relief 5

(**27:18-31:20**).  Mr. Gherini then projects that I would not like to resume my threat assessment hearing under any circumstances (*Doc. #81 pg. 2*), regardless of the condition against university policy that I raised with him via email and in court documents (*Doc. #127 pg. 22-26*).  I responded by indicating that I would resume the threat assessment hearing if the condition for me to cancel my litigation "as an exchange" to move forward with the process was removed, and I would have also remembered to ask to remove the condition which violates university policy on procedural due process if the video did not cut out at that time (**31:50-33:28**).

12/22/2023 14:18

1. (**1:57-3:09**) We start off this second conference with Mr. Gherini asking what my claims to federal jurisdiction rest on, which I previously disclosed to him in point 4 above during the first conference (**2:06-3:09**).  However, I did not mention the *Steffel* precedent by name, and I also confused the duties of public officials with the rights of private individuals under CPC 632 again. In the *Steffel* precedent, the Supreme Court ruled that the threat of State prosecution without any pending litigation is the duty of federal courts to take up, unlike in the case where there is pending State litigation (*415 U.S. 452 at 462*).  The *Steffel* precedent constitutes an exception to the normal requirements to exhaust judicial remedies.

2. (**3:22-14:46**) Mr. Gherini asks for clarification on the relevance of due process, to which I replied that the right was violated when Dr. Tau denied my liberty to record the threat assessment hearing as a condition of rescheduling and resuming the process, and when Mr. Coronel issued my punishments as a result of me recording the student conduct hearings in part (**3:22-5:49**). Then Mr. Gherini raised an issue about US CONST Amd. XI precluding the university from federal liability (**5:50-6:33**).  However, Amd. XI only precludes suits brought by citizens of another State or of a foreign nation, whereas I have resided in CA for my entire life (*Doc. #141 pg. 12-13*).  Mr. Gherini then agrees to accept the service of documents by email (**7:50-8:34**) as

he also did via email (*Doc. #130 pg. 68*).  Then, I mention that I filed a document with the court mentioning two "nonsensitive" disclosures which I requested for Mr. Gherini to retrieve as well as "phase two" disclosures which I did not reveal at the time (**9:12-11:30**) (*Doc. #37*).  I also requested to hold a set of conferences to clarify the pleadings which Mr. Gherini has had such a hard time understanding (**at 10:20**).  We conclude the conference after Mr. Gherini asks me to send him the new filings (*Doc. #130 pg. 69-70*) (**12:34-14:46**)

**1/8/2023 10:37**

**1. (00:00-5:50)** Mr. Gherini acknowledged the requirement for the parties to meet and confer to clarify the pleadings (**00:20-00:30**) and agreed that we will need to "schedule a larger window of time" if the pleadings are still unclear (**1:00-1:15**).  However, January 8th of 2024 was the final conference Mr. Gherini was willing to hold.  Mr. Gherini never accepted my many requests to further "sort out" the pleadings (**at 1:28**).  Mr. Gherini nevertheless repeatedly asserted his own lack of "understanding" of the "information" contained in the pleadings as a defense in the case, against FRCP 8(b)(2), 8(b)(5), and 11(b)(4) despite the opportunity to have held several more conferences to clarify the pleadings (*Doc. #130 pg. 78*).  His deniability to assert his own lack of understanding of case information as a defense, given the many opportunities we had to hold more conferences to sort out the pleadings, is unplausible, and it is not a fair defense.  Mr. Gherini then asks whether there are still lines of inquiry which I did not file at that time, to which I answered that I had filed many of them and provided notice for what I still had not filed (**1:44-3:55**) (*Docs. 40-42 & 50-53*).  Mr. Gherini's question serves as evidence that he may not even be reading case documents very thoroughly if at all as shown throughout case documents, similarly to asking about the object of my claim to federal jurisdiction in the previous conference (*Docs. 65, 68, 70, 77, 79, 83, 87, 90, 96, 117, 122*).  While we are discussing Mr. Gherini's "generic statement" defense and motions that I have zero federal claims and zero evidence in Doc. #57 before they were filed, he asks me to repeat each line of inquiry much like in point 2 above during

the first conference (**3:56-5:50**).

**2. (5:51-12:27)** I go on to further illustrate how little into my claims Mr. Gherini has even read into despite his asserted defense that I have "zero evidence."   My illustration mentions how Janet Cardenas wrongly perceived me as a protected class to make an "unofficial medical diagnosis" in order to ignore my attempts to launch a whistleblower investigation in 2020, eventually breach the "Guidelines on Discrimination and Harassment G(4)(a)" duty of care in university dorm housing, and lead to the irreparable injury to my financial aid qualifications in the form of a permanent term of disciplinary probation against UC PACAOS 105.03 (**5:51-7:24**) (*Doc. #130 pg. 28*).  I did not explain the elements of the issue at first only to illustrate that Mr. Gherini is asserting an unfair defense without even having read into the claims enough to make the defense credibly.  I go on for the next 4 minutes describing those elements of how Mrs. Cardenas made a prejudicial conclusion that is outside of the scope of her authority in order to assign me a mental health counselor, instead of directing me to the whistleblower office to investigate the picture of my former warehouse boss from Norcal on the Socal university law school career office page, and also instead of taking action against the "food safety: issue in dorm housing under her control which led to my suspension later on (**7:24-12:27**).

**3. (12:30-20:26)** Based on Mr. Gherini's response in Doc. #57, I ask if he is struggling with the "theories and plausibility," to which he replies by asking about the theory behind the "unofficial medical diagnosis (**12:30-14:45**).  While Mrs. Cardenas' decision to wrongfully perceive me as a protected class is not a claim in itself, student dorm housing officials nevertheless do not have authority to make medical diagnoses within the "strict construction" of their authority unless they are a certified psychiatrist.  Instead, the "unofficial medical diagnosis" line of inquiry serves as corroboration for Mrs. Cardenas' refusal to direct me to the whistleblower office and then breach the duty of care related to safety in dorm housing by ignoring my inquiries related to the food safety issue (**14:50-18:38**) (*Doc. #131 pg. 235-236*).  The theories relevant to this line of inquiry

are the breach of the duty of care as well as strict construction, the "unconscionability" of irreparable injury to my young-adult life's time and efforts, or possibly even "retaliation." The irreparable injury precedent I cited in case documents is derived from *US v. Carroll Towing (159 F.2d 169 (2d Cir. 1947))*. Just as in the previous conference, Mr. Gherini projects that "participating in the threat assessment hearing" was my issue "because I wanted to record the hearing." If Mr. Gherini read the case documents more closely, he would know that I am willing to resume the threat assessment hearing if the unlawful conditions placed on the university's willingness to resume the hearing would cease (1**8:40-20:26**) (*Doc. #127 pg. 22-26*). Why would someone participate in any process if participation in that process depended on unlawful conditions that were artificially placed on that participation?

**4. (20:27-27:00)** Mr. Gherini continued by asking me about the "university software" line of inquiry relevant to request for relief 1 and the "handshake account" line of inquiry relevant to request for relief 3 (**20:27-22-00**). If Mr. Gherini were paying attention and taking effective notes about his own questions during the previous conferences, he would know that I removed request for relief 1 in Doc. #16 and that the purpose of request for relief 3 is only to serve as corroborative evidence. In my first conference from point 2 above, I mentioned to Mr. Gherini that requests 2, 4, and 5 were the major areas of concern to focus on. Nevertheless, Mr. Gherini was more interested in avoiding questions about the most important case facts, and he instead asked me about requests 1 and 3 in the most detail, despite their overall removal from my claims (**22:14-23:30**). I even implied that we should be talking about more important case matters at this time (**at 23:05**). I try to bring the focus back to more important facts, such as the picture of my former Norcal warehouse boss found on the law school's career page relevant to request for relief 5 (**23:32-27:00**) (*Docs. 50 & 51*).

**5. (27:05-31:30)** Mr. Gherini asks why I cannot disclose more about the unknown retaliation issue, to which I indicate that those materials should be considered as protected trial-prep

materials by searching for more information I could disclose so he could "assess the quality" of the claim under FRCP 26(b)(5) (**27:05-28:13**).  I mention the fact that the law school's career office is "the part of the university I am most interested in," which is directly relevant to my former Norcal warehouse boss' promise to retaliate against "my future" (*Docs. 50 & 51*). Alongside the disclosures relevant to request for relief 5 being claimed as protected trial-prep materials, I have already experienced in my life "the reasonable expectations" that would come with releasing the information before I am sure doing so can be done "securely" (**28:15-29:30**). My "other" claims to federal jurisdiction include (1) my audio recordings under the *Steffel* theory for exhausting judicial remedies, and (2) the irreparable injuries to my young-adult life's academic and free time as well as my financial aid qualifications under the *Carroll* theory (**at 29:50**).  Mr. Gherini follows by asking me if I have a response to the "Amd. XI" defense, to which I raise the construction of the amendment as I described in point 2 above for the second conference (**29:57-31:30**).  I ask Mr. Gherini if he has read the amendment and "who" it precludes from bringing federal claims against a State agency, because I am a citizen of CA and UCI is located in CA.  According to the construction of the amendment, it does not preclude my claims.  In the cases raised by Mr. Gherini in Doc. #57, the respective courts specifically acknowledge the language of Amd. XI (*Doc. #141 pg. 12-13*).

**6. (33:00-37:45)** Mr. Gherini asks if there is anything else I would like to talk about, to which I start reviewing the things we have already talked about given his short-term memory when it comes to "understanding" case "information" as demonstrated throughout my case (*Docs. 65, 68, 70, 77, 79, 83, 87, 90, 96, 117, 122*).  Mr. Gherini asserts that he "does not agree" with the relevance of the unconscionable negligence theory, to which I reply that he previously said that he didn't even know what it is, and he agreed (**33:00-34:15**).  I would highlight this statement as more corroboration of Mr. Gherini's lack of credibility when reading case documents and in making defenses, as demonstrated throughout my case and in our conferences (a**t 17:34**).  I repeat to Mr. Gherini in this conference that we need to "schedule a larger window of time" to eliminate

the lack of clarity (**at 35:30**).  However, Mr. Gherini instead chose not to schedule another conference and chose to make unfair defenses based on an unclear "understanding" of case "information" against FRCP 8(b)(2), 8(b)(5), and 11(b)(4).  Mr. Gherini's choice not to schedule more conferences for clarification while claiming a defense based on his own poor understanding of case documents, paired with the direct evidence of that poor understanding of case documents demonstrated in these audio recordings, proves that Mr. Gherini is either not a competent reader or he is intentionally avoiding the facts of the case.

**Exhibits D(3) LTCC Preliminary Hearing 2025**

**2/19/2025 12:45**

**1. (3:00-9:12**) The preliminary hearing starts with me asking about the school's procedures on the crossexamination of witnesses in LTCC AP 5520, to which Mrs. Batista replied by instead discussing the school's power to remove persons from their campus (**3:00-3:38**).  Before resuming to this topic in point 3 below, I addressed her reply about the reason I was removed from the LTCC campus on February 13th of 2025 for an alleged incident that occurred in November (**3:40-5:02**).  I mentioned that the notice for interim suspension I was given wrongly alleged that I was asked to stay and wait for police over a "perceived threat" on November 15th of 2024 (*Doc. #143 pg. 7*).  But instead, I was suddenly asked to leave after inviting interactions with one of the security personnel, and then I had more interactions with both involved security personnel afterward in front of a security camera minutes later where I was still not asked to stay nor leave again (**at 4:15**).  The policy mentioned above requires that I am given notice of an issue within five days of its reported occurrence, and this time period did not begin until January 7th of 2025 because both security personnel who have attended multiple sessions at the gym with me could then identify me as a student (*Doc. #143 pg. 2-3*).  Mrs. Batista then said that she was informed by security personnel of the "real issue" for my removal from campus addressed in point 2 below on the day I was removed from campus (**5:48-6:42**).  The fact that security

informed Mrs. Batista of the complaints on the day I was removed from campus, and the fact that I was removed in February allegedly for an incident that occurred in November after the January deadline to punish me for it had expired, is relevant because it shows a pattern of security's attempt to use the November event to conceal the February incident which occurred during the same week I was removed (*Doc. #143 pg. 2-3*). When I addressed the timeline of security's attempt to conceal the real issue, Mrs. Batista stated that I "was not a student" in November as if I had not just previously stated to her that fact when I mentioned that the "5520" deadline did not start in November but instead in January (**7:31-9:12**).

**2.** (**9:16-14:44**) Mrs. Batista then asks about allegations of "sexual" harassment in the form of "leaving gifts" for someone, to which I reply by describing the "isolation of time between the events" with one occurrence in 2019 and two in 2025 (**9:16-11:20**). Mrs. Batista still insists a severity of misconduct with there being "multiple interactions," which is addressed more in this point below (**11:22-12:16**). Mrs. Batista then insists that the content of my notes given to the individual based on "distress" and "friendship" still constitute a "sexual" nature, which is addressed more in point 5 below (**12:18-14:25**). I then indicate that an event where the female individual interacted with me in 2020 gave me an impression that I not only could speak to her in the future, but that refraining from speaking to her at all during the academic year following the incident was a mistake despite being suspended for talking to her without her first indicating to me not to (**14:28-14:44**). After six years of not interacting, trying to interact with someone again in a nonsexual way is not sexual misconduct or unreasonable, especially if they interacted with you in an apparently positive way after the bad interaction (*Doc. #143 pg. 3*). The events in 2019 are directly related to the student confidentiality issues raised in this case.

**3.** (**15:40-22:40**). At this point, I resume the conversation about the crossexamination of witnesses. Mrs. Batista first begins by answering my question about whether it will be necessary despite the "5520" policy (**15:48-16:30**), to which I reply by mentioning some of the elements of

duress mentioned in my LTCC complaints and relevant to the rest of this case. I asked whether another hearing will be necessary with the presumption that I may be able to return to the gym "under certain conditions" to have "stimulation in my life" given my circumstances (**at 20:35**). Mrs. Batista asks if I would like an official hearing, where she still insists not to crossexamine witnesses (**16:55-18:19**). After I insisted to implement the school's policy several times, Mrs. Batista agrees that it should be followed (**18:20-18:36**). I then mention the potential issue from where the entirety of the confidentiality issues between the two colleges may stem if the cause is not from the interactions with the female student (**18:45-19:16**). I then go over the four distorted allegations in my interim suspension notice: (1) that I fled the campus in November and was instructed to wait for police, (2) that I was "staring," (3) that the nature of the events are "sexual" in any way, and (4) the school's representation of "persistent misconduct" in the form of my isolated interactions mentioned in point 2 above (**19:29-19:59**). Mrs. Batista eventually responds to the issue of persistence by stating that the issue has been misrepresented to her as a "nonstop" issue (**22:00-22:40**).

**4.** (**22:45-27:47**) I raise the issue again about security's use of the November event beyond the school's "5520" time limit policy to conceal the February incident, starting at 20:45. Mrs. Batista insists that school policy allows anyone to be removed from campus for any reason, but I raise the issue that the school policy has legal limits such as if it can be used to conceal whether legal wrongdoing has occurred (**22:45-23:37**). There is no doubt that school policy enables broad power to remove someone from campus under normal conditions, but the policy cannot be used to break other laws (*Doc. #141 pg. 4-5*). I then briefly illustrate the issues with testimonials when Mrs. Batista stated that I was asked to leave campus in conflict with the interim notice and I replied that "I was not asked to leave according to security personnel" as shown on security footage, where she tried to jump on an opportunity consistent with only half of my statement despite the existence of the footage (**23:40-24:20**). After twice conclusively insisting that there was "no concealment" earlier in the recording based on the information she was provided by

other parties, Mrs. Batista finally defers the observation of those facts to security personnel (**24:28-25:58**).  She even insists that I "already knew the real reason" I was removed from campus (**at 25:48**) that she "was dealing with" (**at 25:04**), even though "I did not have enough information at that moment" to prove the real reason (**at 25:12**).  Mrs. Batista's statement is indicative that she was aware of any documentation showing the use of the November event to conceal the February incident.  I then reiterate that four out of five of the allegations against me are distortions "at issue," including the conflict between school policy and precedent on concealing legal wrongdoing (**26:02-27:47**).

**5.** (**27:50-34:54**). Despite acknowledging that my "harassment" is not persistent at 19:30, she reverses that acknowledgment to insist that I am "stalking" the female individual "more than once, multiple times" despite the mechanics of those interactions described in point 2 above (**27:50-28:23**).  I ask to be sent what defines sexual misconduct within school policy, to which she agrees (**28:25-30:55**).  I remark on whether the policy is broader than encompassing acts that are not slightly sexual in nature (**at 29:00**), and then I pose two hypothetical scenarios to ask about whether certain unrelated behaviors would fall under the policy (**at 29:27**).  The first hypothetical is based on the elements of my incident, to which Mrs. Batista replied that talking to someone who is "not responding/positively" to you may fall under policy defining sexual behavior.  The second hypothetical intends to illustrate the extreme nature of the school's interpretation: "If I tell someone not to talk to me, and they do, is it [harassment of a sexual nature]" or something else?  Mrs. Batista then reads me the policy on sexual misconduct which includes "dating violence, domestic violence, fondling, harassment, hostile environment, incest, quid pro quo harassment, rape, retaliation, sexual offenses, sexual assault, sexual harassment, sodomy, and stalking" (**30:57-31:14**).  Evidently, school policy consists of a lopsided redundancy by making any "harassment" characterizable as "sexual."  Mrs. Batista then insists that going to the gym "at the same time, multiple times" as the female individual is considered stalking, which could consist of similarly absurd hypotheticals as those posed above (**31:15-32:57**).  I was also

accused of "staring" at the female individual, which I raised in my response to the interim notice as a form of distorting the facts with a motivation to seek harsher punishment of me by retaliation (**at 33:18**).  Then, based on that response and the definition provided to me by Mrs. Batista, I ask if I could report the retaliation, to which she responded that reporting the retaliatory distortion of facts would be retaliation on my part (**33:34-34:54**).  Mrs. Batista may have only projected the offense back at me due to her having forgotten that I raised that the intent of distorting the facts was likely done in order to seek harsher punishment in my response to the notice (*Doc. #143 pg. 4*).  I even mention the element of distorting facts to seek a harsher punishment, but Mrs. Batista brushes off the notion by saying "I can attempt to" (**at 33:52**) report the lie and possibly be accused of retaliation for doing so (**at 34:47**).

**6.** (**35:01-41:22**) I reiterate that all of the allegations against me except for "leaving gifts" are in contention (**35:01-35:44**).  I then reiterate some of the facts: the November security footage, the incorrect dates, whether seeking a harsher punishment by lying is retaliation, security personnel's misrepresentation of the time they were able to identify me as a student, and the duress of my life circumstances and being removed from my only stimulation in life right now (**36:08-37:52**).  Amongst this list, Mrs. Batista states that "she understands" that I am disputing all of the allegations, despite listing four out of the five at least twice beforehand (**at 37:03**).  Mrs. Batista indicates that the process may change so the nature of the "sexual" events are reported as a "title IX offense" (**37:59-39:07**).  I ask why I was never consulted about my first complaint about the security personnel filed on the day I was removed from campus, to which she replies that it is a separate manner even though its original use to conceal the other issues shows that it is not separate (**39:13-40:10**).  I then ask how my second complaint, focused in part on whether embellishing my behavior as staring in order to seek harsher punishment of me, will be addressed, to which the conversation continues with me illustrating that the first complaint is not a separate matter (**40:12-40:53**).  I then follow by asking for Mrs. Batista's thoughts on one of the matters in my first complaint: whether the alleged "threats" I made to security personnel described therein

would be considered a credible threat (**40:58-41:22**).  Basically, I became loud and spoke about "AI, time travel, neuralink, and space criminal pirate lawyers" to Gabriel when he accused me of making a threat, after warmly inviting me into the gym at the same time as him and then suddenly telling me to leave (*Doc. #143 pg. 2-3*).

**7.** (**41:25-46:37**) I then ask Mrs. Batista if she will take more thorough notes of my two complaints and response to the interim notice, based on the lack of feedback from her on their contents (**41:25-42:09**).  I then ask Mrs. Batista if the school has policy on punishing a student for acts committed while under duress, like that of UC PACAOS 171.11, to which she replies that she will get back to me when she knows (**42:18-42:50**).  I reiterate elements of the school's original concealment of the February incident with the event in November one more time (**43:04-43:17**).  The meeting concludes with me asking Mrs. Batista about the unconscionability doctrine and how much she has looked into the "2019 documents" (**43:22-46:37**).  Based on the irreparable injuries I expressed throughout this case, I raised them here because of the fact that the student confidentiality issues at UCI follow a pattern that followed me from LTCC, and because my removal from the gym constitutes being removed from my only stimulation in life right now based on my circumstances of life (*Doc. #143 pg. 5*).  Before minute 3:00 of this hearing, Mrs. Batista stated that she "looked passed" relevant documents, so I mention the topic at the end of the hearing because their contents are directly related to the student confidentiality issues about my duress (**at 44:22**).

**Exhibits D(4) LTCC Final Hearing 2025**
**3/12/2025 16:11**

**1. (00:00-5:29)** After outlining the hearing process, Mrs. Carroll asks if there are any questions about the process (**00:00-2:15**).  I start by ask if the panel has received one of my exhibits, to

- 34 -

which Mrs. Carroll responds by interjecting that questions about reviewing the evidence are not procedural questions (**2:16-2:52**). I follow by illustrating how the purpose of the hearing process is to review the relevant evidence, and therefore that a question about whether all of the relevant evidence has been included is a procedural question (**2:54-3:26**). Mrs. Carroll follows by repeating her view that purports that the process involves something other than a review of the relevant evidence, in order to maintain a position to deny my question about whether relevant evidence will be included in the review process (**3:27-3:54**). After I raised the concern that evidence has likely been excluded, Mrs. Carroll responds by stating that she "does not know" if all of the relevant evidence has been included and that it is "not" her job to make sure the student disciplinary action she was leading does not unfairly and inequitably exclude evidence that is directly relevant to the matters at hand **(3:56-4:19)**. Mrs. Carroll even attempted to change the nature of her original question for open-ended questions about the process to a yes-or-no "do I understand the process," which was not her original question (**4:22-4:47**). By effect of her own contradiction, Mrs. Carroll then said that she will "only tell me one more time" not to ask her any more procedural questions about the inclusion and exclusion of evidence, even though she had stopped me from asking any of them (**4:48-5:01**). In response, I asked Mrs. Carroll if the process can still move forward "without relevant evidence, without relevant witnesses, and against LTCC's established policy" on due process procedures, to which she implicitly answered yes (**5:02-5:29**). After the feedback I was given during and after my preliminary hearing, especially when it came to scheduling that was available to all of the witnesses, I intended to ask several procedural questions to determine whether all of the relevant evidence had been submitted to the panel before the hearing. Mrs. Carroll continued to insist that asking questions to verify whether relevant evidence has been excluded from the process are not procedural. How is the review of relevant evidence not a part of the process, and how is a question about whether all of the evidence has been included in the process not a procedural question? In combination with Mrs. Batista's 'scheduling errors,' Mrs. Carroll's reframing of her question to project an appearance that my questions about the procedure were not procedural and I should be ashamed for asking

them is indicative of a premeditated intent to deny my due process rights by denying the review of "germane" evidence.

**2. (5:49-8:42)** Mrs. Batista begins her speaking time by showing her unfamiliarity with the included body of incomplete evidence by confusing the dates of my interaction with security personnel between Monday, November 11th (Veteran's Day) when the campus was closed with Friday, November 15th (**5:49-6:42**). Mrs. Batista's confusion of the November dates is also significant because she stated the wrong issue, and her decision to do so with all the time she had to review the timeline of events and her notes in front of her follows a pattern of her intentful embellishment of the allegation of "persistent misconduct" which she said she would remove from the case during the preliminary hearing (*Doc. #143 pg. 3*). I did not interact with the female individual who made the complaint against me until after January, which Mrs. Batista later corrected (**at 6:40**). Mrs. Batista had also confused the dates during the preliminary hearing *(pg. above at 4:13*). Then, Mrs. Batista reveals a response from the female individual about "amicability" that could have only been made if she was directly provided with my sixth listed complaint after she was originally questioned on February 13th, before I made my complaint (*Doc. #143 pg. 3*). Meanwhile, I was not provided with their complaint against me in a similar way (**7:09-7:26**). Mrs. Batista also mentioned "texts," but I never texted the female individual, and this follows Mrs. Batista's pattern of embellishing the facts (a**t 7:36**). Mrs. Batista then illustrated the gifts I left "over two weeks, over a couple of days" in a way that creates an embellished appearance of multiple incidents (**8:18-8:42**).

**3. (10:00-13:57)** Mrs. Batista states that there is "a dispute" about whether the date my interaction with security personnel occurred on a date that she must have forgotten that the campus was closed, but she would have known better than to make such minute embellishments if only she had obtained the security footage to include it as evidence like I asked her during the preliminary hearing (**at 10:38**). Then, Mrs. Batista goes along with the assertion that security personnel were

not able to "put together" identifying me as a student until February, after one month of being in the gym with the same two security personnel who I interacted with in November and who evidently recognized me without a problem and interacted with me since January (**11:01-11:14**). Then, she misrepresented my "focus" during the recorded preliminary hearing in a way that would purport that I was trying to avoid other topics, which can be verified as false with that recording (**11:31-12:04**). More likely, Mrs. Batista removed the questionable security matter because the issue was sloppily used to conceal the other matters (**12:13-12:40**). Then, Mrs. Batista recommended my expulsion from LTCC, even though both suspension notices recommend suspension for the winter quarter (**13:44-13:57**).

**4. (14:00-25:06)** Before my speaking time began, Mrs. Carroll made an ironic statement about "making sure I have all the time that I need," given what would happen next (**14:00-14:06**). I make my presentation, where I mention the "2019" student disciplinary records that were not included as evidence in the proceeding (a**t 16:27**). I also mention how the student confidentiality issues that followed me from LTCC to UCI have produced irreparable injuries to my young adult life's time and efforts (**16:40-17:09**). I also mention how Mrs. Batista told me she would remove the "persistent misconduct" issue from the list of allegations during the preliminary hearing because it was misrepresented to her as "a nonstop issue" (**17:42-18:09**). I also mention how Mrs. Batista called a witness for me for the security matter that was removed from the list of allegations while refusing to call witnesses for me for the matters in "focus" (**18:11-18:47**). I also mention how Mrs. Batista is applying a broadened scope of sexual misconduct policies to the inexplicit context of my notes (**19:57-20:32**). At 4:20 into my speaking time, Mrs. Carroll interjects to inform me that the ultimately irrelevant witness who was called upon is waiting to be questioned (**20:34-21:07**). Mrs. Batista already informed me that the security director would be included as a witness, so the relevance of Mrs. Carroll's intended reason for cutting into my time at face value was just as relevant as the inclusion of the witness for the removed matter (*Doc. #143 pg. 28*). I asked to have my time back, but Mrs. Carroll refused (**21:12-21:49**). I then do

my best to continue my presentation after being cut off and drawn into distraction during my already-limited time slot (**21:50-25:06**).

**5. (26:53-33:47)** Mrs. Batista and I were then given five minutes to state rebuttals.  Mrs. Batista mentioned that she "does not understand" why I thought interacting with someone after not interacting for six years is "okay," and this corroborates her unfamiliarity with the relevant materials such as my sixth listed complaint on page 3 of Doc. #143 (**26:53-26:59**).  In my rebuttal, I began by highlighting this point with the length of time when it may be reasonable to try to interact with someone after not interacting, the positive interaction initiated by the female individual since that time, and how I did not interact with her during the remainder of my time at LTCC before graduating (**27:18-28:34**).  I then mention how the panel members cannot make a sound conclusion about the explicit or inexplicit content of the notes I left in correlation with an allegation of sexual misconduct without observing the content of those notes for themselves (**29:39-29:59**).  The meeting was then swiftly concluded before I could question the security director to demonstrate why that matter was truly removed (**30:00-33:47**).

**Exhibits D(6) Phone Calls with LTCC Personnel 2025**

**1. 4/3/25 11:19 (00:00-1:30)** My first call that was answered was made to the LTCC HR Director, Shelley Yohnka.  In order to try to get LTCC officials to admit that Daniel Gonzalez is still employed at the school in each call, I presented myself as a city human resources official who was asking employment screening questions (**00:02-00:18**).  Mrs. Yohnka then asked me to email her instead (**00:27-00:42**).  Before ending the call, I asked Mrs. Yohnka if she knew off of the top of her head whether Daniel Gonzalez was currently employed, to which she answered that she would not release any information until I sent her materials from a city inbox (**00:52-1:02**).

**2. 4/7/25 11:56 (1:34-5:14)** My second call that was answered was made to the LTCC Human Resources Specialist, Laura Ryland.  Mrs. Ryland asked whether the email was about Daniel,

which indicates that LTCC human resources whom I have not contacted before were familiar with my inquiry (a**t 1:53**).  Mrs. Ryland asked for the title of the email I sent, and my computer took some time to load (**2:21-3:39**).  I asked her if she saw the email, to which she replied "this is the first time I saw it," and if her response is true in lieu of knowing about my inquiry, her response is indicative of communication between Mrs. Ryland, Mrs. Yohnka, and possibly others about the immediate significance of the employment status of Daniel Gonzalez to those LTCC human resources personnel (**3:41-3:54**).  Mrs. Ryland states that she will call Daniel herself right after this phone call, indicating that he is an accessible LTCC Human Resources contact (**4:24-5:14**).

**3. 4/7/25 14:44 (5:17-5:14)** My third call that was answered was made to Mrs. Ryland.  Mrs. Ryland asked for a signed release on the theoretical application where Daniel would have consented to have a potential employer contact previous employers (**5:26-5:45**).  I tried my best to play the described social role (**5:47-6:21**).  I asked Mrs. Ryland if she had personally called Daniel after she had previously said she would, and she answered "yes," indicating that Daniel Gonzalez is an accessible LTCC Human Resources contact (**6:30-6:36**).

April 10th, 2025

By: *Bobby Gonzales*
_____

Robert V. Gonzales

DEFENDANTS RULE 26 DISCLOSURES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS RULE 26 DISCLOSURES